

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | § | |
|---|---|---|
| RIDGE NATURAL RESOURCES, L.L.C, CALVIN SMAJSTRLA, CHRISTOPHER HAWA, and WILSON HAWA, | § | No. 08-17-00227-CV |
| | § | |
| Appellants, | § | Appeal from the |
| | § | |
| v. | § | 109th District Court |
| | § | |
| DOUBLE EAGLE ROYALTY, L.P., | § | of Winkler County, Texas |
| | § | |
| Appellee. | § | (TC# DC 17-17111) |
| | § | |

# **O P I N I O N**

This is an arbitration case in which two oil companies are fighting for title to a disputed royalty interest in minerals located in Winkler County. Both oil companies claim this interest was transferred to them at different times by siblings James William McDaniel and Jolinda McDaniel Benjamin (the McDaniels). The McDaniels are not parties to this lawsuit, but their actions bear heavily on the case at hand.

When Double Eagle Royalty—the second-in-time transferee that purportedly acquired the McDaniels' mineral interests—filed suit to quiet title to the disputed royalty interest, first-in-time transferee Ridge Natural Resources, L.L.C., moved to compel arbitration based on an arbitration clause in a "lease agreement" it signed with the McDaniels prior to Double Eagle's purported acquisition of the McDaniels' interests. Double Eagle does not dispute that if the arbitration

agreement is valid, the agreement binds Double Eagle as the McDaniels' successor-in-interest. But Double Eagle maintains that the arbitration clause contained in the lease agreement should be struck down because it is substantively and procedurally unconscionable. The trial court agreed, denying Ridge's motion to compel arbitration.

We will reverse. While we agree that the agreement's cap on punitive damages is against public policy and must be stricken, Double Eagle has not provided sufficient evidence to meet the high bar of unconscionability necessary for this Court to dissolve this arbitration agreement in its entirety.

## I.

## BACKGROUND

### *A Brief Synopsis of Oil and Gas Rights*

Although an in-depth examination of oil-and-gas principles is not necessary to resolve the merits of this appeal, we pause briefly to define the various rights at issue in a mineral estate so as to ground our subsequent discussion and provide context as to what rights the McDaniels purportedly believed they were conveying, and what rights may have actually been conveyed in the agreement the McDaniels signed.

Interests in oil and gas rights, including royalty interests, are considered to be real property. *Navasota Res., Ltd. v. Heep Petroleum, Inc.*, 212 S.W.3d 463, 480 n.11 (Tex.App.--Austin 2006, no pet.). "A property owner's rights are often described as a bundle of rights, or a bundle of sticks." *Lightning Oil Co. v. Anadarko E&P Onshore, L.L.C.*, 520 S.W.3d 39, 48 (Tex. 2017). A property owner is free to retain all rights in a piece of real estate for himself or herself, or else sever the sticks from one another and distribute individual rights in whatever fashion or combination he or she so chooses. *Id*.

2

When a mineral estate is severed from the surface estate, there are five "sticks" available for distribution related to that estate: (1) the right to develop; (2) the right to lease; (3) the right to receive bonus payments; (4) the right to receive delay rentals; and (5) the right to receive royalty payments. *Id*. at 49. The right to develop is a possessory right that gives the holder "the exclusive right to possess, use, and appropriate gas and oil[.]" *Id*. The right to lease is an executive right; the holder "enjoys the exclusive right to make and amend mineral leases and, correspondingly, to negotiate for the payment of bonuses, delay rentals, and royalties, subject to a duty of utmost good faith and fair dealing to non-executive interest holders." *Hysaw v. Dawkins*, 483 S.W.3d 1, 9 (Tex. 2016). The last three rights are all passive, non-possessory, non-executive rights to the proceeds from the production of minerals. *Id*. Bonuses are payments made in addition to royalties and rent that act as incentives for a lessor to sign a lease. *In re Estate of Slaughter*, 305 S.W.3d 804, 811 (Tex.App.--Texarkana 2010, no pet.). Delay rentals are payments made by the lessee during the primary term to perpetuate a lease when the lessee is not actively drilling or developing the leasehold. *Id*.; 55A TEX.JUR.3D OIL AND GAS § 344 (2018). And a royalty interest is "a share of production--or the value or proceeds of production, free of the costs of production--when and if there is production." [Internal citation omitted]. *In re Estate of Slaughter*, 305 S.W.3d at 811. "These interests differ significantly in their nature, and ordinarily, at any given time, only one of these types of consideration is payable; one receiving royalties is not receiving rentals, and usually not receiving bonuses, royalties being no part of bonuses or rentals." 55A TEX.JUR.3D OIL AND GAS § 343 (2018).

Bearing these distinctions in mind, we proceed.

### *The McDaniels Sign a "Royalty Lease" with Ridge*

In October 2016, Ridge, through its agents, reached out to the McDaniels and made an

offer to lease certain mineral interests in Winkler County. The McDaniels had previously executed a production lease on their land with SWEPI, L.P., in 2004. The McDaniels informed Ridge about the SWEPI lease. According to the McDaniels, Ridge assured them that a pre-existing lease was "no problem" and would not affect the validity of Ridge's offer. Ridge then emailed both the McDaniels a cover letter with a proposed agreement attached.

The cover letter reads as follows:

Dear Mr. McDaniel [and Mrs. Benjamin],

We are interested in leasing your interest located in Winkler County, Texas to the following Land:

Section 9, Block 27, Public School Land Survey, Winkler County, Texas.

Ridge Natural Resources is aware that there may currently be existing oil and gas lease or leases [sic] on this Land. This lease offer is made subject to any existing lease(s) that you may have in place on this Land, and shall in no way invalidate or interfere with those existing leases.

On behalf of Ridge Natural Resources, we would like to offer you $325.00/net royalty acre along with a 1/4 Royalty to lease your interest in the above-described tract of Land.

Therefore, your Lease Payment would be:

320.00 Net Royalty Acres X $325.00/acre = $104,000.00

Therefore, we are offering you $104,000.00 and 1/4th of the Royalty to lease your interest for 5 years and an additional 3 year option to extend. We do not extend open-ended offers, so this offer is valid for one month, or until November 10th, 2016.

I have enclosed the Lease for your review. If you are interested in leasing, please insure that your information (name and address) are entered and spelled correctly. When you are ready to sign, you will need to sign the document in the presence of a Notary Public. Once the Lease is signed and notarized, please send it back to the address listed below.

.    .    .

Once we receive the Lease in the mail, we will promptly get a Check for

$104,000.00 made out to you and sent to your address. This should take between 3 to 5 days.

Jolinda McDaniel testified in an affidavit that she believed the lease offer was for a traditional top lease.[1] In fact, although the interpretation and validity of the interest conveyed by the lease are in dispute, the contract the McDaniels signed appears to be more akin to a non-participating royalty agreement[2] that entitled Ridge to 75 percent of royalties, but that did not grant Ridge any executive rights or require Ridge to perform any exploration or development itself.[3]

---

[1] A top lease is a contingent proprietary interest in a mineral estate that springs into existence upon the failure of an original lease. *Anadarko Petroleum Corp. v. TRO-X, L.P.*, 511 S.W.3d 778, 780 n.3 (Tex.App.--El Paso 2016), *aff'd*, 548 S.W.3d 458 (Tex. 2018). In essence, a top lease is a back-up lease granted after premises have already been leased.

[2] "A non-participating royalty interest is an interest in the gross production of oil, gas, and other minerals carved out of the mineral fee estate as a free royalty[.]" *KCM Fin., L.L.C. v. Bradshaw*, 457 S.W.3d 70, 75 (Tex. 2015). A non-participating royalty interest "entitles its owner to a share of the production proceeds, free of the expenses of exploration and production." *Plainsman Trading Co. v. Crews*, 898 S.W.2d 786, 789 (Tex. 1995). However, a non-participating royalty interest holder's right is non-possessory (meaning that the interest holder is not entitled to come to the land for any purpose or otherwise possess the minerals) and non-executory (meaning that the NPRI holder has no power to dispose of the minerals and holds an interest contingent on the actions of the executive interest holders, i.e. the landowner). *Id.*; *KCM Fin., L.L.C.*, 457 S.W.3d at 75.

[3] The relevant terms of the Royalty Agreement regarding the interest that was conveyed are as follows:

**Oil and Gas Royalty Lease**
THIS LEASE AGREEMENT is made as of the **10th** day of **October, 2016** between:
**James William McDaniel [Jolinda McDaniel Benjamin]**

As Lessor (whether one or more) . . . and **Ridge Natural Resources** . . . as Lessee. All printed portions of this royalty lease were prepared by the party hereinabove named as Lessee, but all other provisions (including the completion of blank spaces) were prepared jointly by Lessor and Lessee.

1. In consideration of ten dollars ($10.00) and other good and valuable consideration in hand paid and the covenants herein contained, Lessor hereby grants, leases and lets exclusively to Lessee, subject to the reservation contained herein, all of Lessor's royalty interest in and to all of the oil, gas and other minerals produced and saved from the hereinafter described lands (the 'Subject Interest'), such Subject Interest to include all proceeds thereof in and to the rights, rentals, royalties and other benefits accrued, accruing and/or to accrue and the right to demand, collect and receive same, hereinafter called leased premises:

   [Legal description omitted]

2. This royalty lease, shall be in force for a primary term of **5** years from the date hereof, and for as long thereafter as oil or gas or other substances covered hereby are produced in paying quantities from the leased premises or from lands pooled therewith.

Although Ridge referenced a ¼-royalty interest in the offer letter, the terms of the lease actually meant that after signing the offer and receiving $104,000 each, the McDaniels would retain a fourth—or 25 percent—of the original royalty interest. The thorny issue of defining the exact nature of that royalty interest is not before the Court in this case, and the parties in their briefs point us to no record evidence as to what the precise estimated value of the Disputed Interest may be.

### *The Royalty Lease's Arbitration Clause*

At issue in this appeal is Paragraph 5, the Royalty Agreement's arbitration clause. It reads as follows:

> In the event of any dispute(s), claim or controversy arising out of or relating to this contract or the breach, termination, enforcement, interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate, the parties agree to participate in at least four (4) hours of mediation in accordance with the commercial mediation rules of the American Arbitration Association before having recourse to arbitration. If the mediation procedure provided for herein does not resolve any such dispute, the parties agree that all disputes between the parties shall be resolved solely by binding arbitration administered by the American Arbitration Association in accordance with its commercial arbitration rules pursuant to the Texas General Arbitration Act. The parties expressly exclude the application of the Federal Arbitration Act. The arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures and in accordance with the Expedited Procedures in those Rules. All proceedings shall be conducted in the City of San Antonio, State of Texas. There shall be one arbitrator. The arbitrator shall apply the internal laws of the State of Texas. . . . The term 'dispute(s)' shall include, but is not limited to all claims, demands and causes of action of any nature, whether in contract or in

---

3. As Royalty on the Subject Interest leased to Lessee herein, Lessor reserves an equal one-fourth (25%) part of the Royalty and other proceeds from the sale of all oil, gas and condensate produced and saved from said Land and the Subject Interested lease to Lessee herein.

4. Lessor hereby expressly represents and warrants that no representation, promise or other statement that is not herein expressed has been made to Lessor in executing this Royalty Lease Document and Lessor did not rely on any representation, promise or other statement made by Lessee and/or Lessee's agent and/or employees, relating to this Royalty Lease or the subject matter thereof, except as set forth herein, and it is the Lessor's express intent to fully disclaim and disavow reliance on any such representation, promise or statement. Lessor expressly acknowledges that this Royalty Lease does not grant Lessee the right to explore for or produce oil, gas, or minerals from the leased premises. [ . . . ]

6

tort, at law or in equity, or arising under or by virtue of any statute or regulation or judicial reasons, that are now recognized by law or that may be created or recognized in the future, for resulting past, present and future personal injuries, contract damages, intentional and/or malicious conduct, actual and/or constructive fraud, statutory and/or common law fraud, class action suit, misrepresentations of any kind and/or character, liable [sic], slander, negligence, gross negligence, and/or deceptive trade practice/consumer protection act damages, all attorney's fees and all penalties of any kind, prejudgment interest and costs of court by virtue of the matters alleged and/or matters arising between parties. . . . The parties hereby waive any rights to punitive or exemplary damages and the arbitrator will not have the authority to award exemplary or punitive damages to either party. [. . .]

### *Double Eagle Acquires the McDaniels' Mineral Interests and Files Suit; Ridge Moves to Arbitrate*

Double Eagle claims ownership of the Disputed Interest at issue in this suit as the McDaniels' successor-in-interest. Double Eagle also separately received an assignment of any claims the McDaniels had against Ridge. Double Eagle sued Ridge and its agents on causes of action for (1) rescission based on unilateral mistake, (2) trespass to try title, (3) suit to quiet title, (4) declaratory judgment, (5) fraud/fraudulent inducement, and (6) conspiracy. Ridge moved to compel arbitration based on Section 5 of the Royalty Agreement. Double Eagle resisted arbitration on substantive and procedural unconscionability grounds and attached affidavits and discovery responses to its defensive pleadings. Relevant to this appeal are two affidavits: one from Jolinda McDaniel describing the course of negotiations; and one from oil and gas expert Terry Cross.

In her affidavit, Jolinda McDaniel averred that "[a]side from owning the minerals under Section 9 and leasing with SWEPI, James and I have no ties to or experience in the oil and gas industry." Jolinda McDaniel further testified that her brother James informed her of the offer from Ridge in October 2016. Based on conversations with James and with Ridge's agent Cal Smajstrla, Jolinda McDaniel believed that the offer on the table was for a top lease. She further testified that she understood that Ridge would have some time to explore and develop oil or gas on the property,

but she also conceded that she "did not read the Royalty Lease in depth" and that neither she nor her brother James "spoke to legal counsel or anyone else about the Royalty Leases[.]" After receiving her check from Ridge, Jolinda McDaniel never contacted Ridge again.

Expert Terry Cross, a Texas attorney board certified in oil, gas, and mineral law, opined that "[i]t would be highly unusual for an Oil and Gas Lease covering Texas land to contain an arbitration provision." He testified that in his forty years' of oil and gas practice, he had reviewed thousands of oil and gas leases and did not recall seeing an arbitration provision in a proposed or executed oil and gas lease, although he had "seen limited arbitration provisions in a lease to address surface damage computations or the values on which royalty would be computed, but these discrete uses of arbitration to address valuation issues are in contrast to an overriding default to arbitration to determine the validity of the lease or contract construction issues arising under the lease."

The trial court denied Ridge's motion to compel arbitration. This interlocutory appeal followed.

## II.

## DISCUSSION

In a single issue with two sub-parts, Ridge contends that the trial court erred by denying its motion to compel arbitration because (1) the parties are subject to an arbitration agreement that deals with the claims at issue, and (2) Double Eagle's unconscionability defenses either should have been resolved by the arbitrator or else fail on the merits even if they were cognizable by the trial court.

### *Standard and Scope of Review*

We apply a bifurcated standard of review in assessing a trial court's decision to not compel arbitration. We defer to the facts as the trial court found them, unless those facts find no legally

8

sufficient footing in the record. *Sidley Austin Brown & Wood, L.L.P. v. J.A. Green Dev. Corp.*, 327 S.W.3d 859, 863 (Tex.App.--Dallas 2010, no pet.). We review the trial court's application of the law to those facts *de novo* and need not defer to the trial court's legal conclusions pertaining to purely legal questions. *Id.*

We use a burden-shifting framework in deciding whether a trial court is required to compel arbitration. A party seeking to compel arbitration must: (1) establish the existence of a valid arbitration agreement; and (2) show that the claims asserted are within the scope of the agreement. *Delfingen US-Texas, L.P. v. Valenzuela*, 407 S.W.3d 791, 797 (Tex.App.--El Paso 2013, no pet.). The initial burden of establishing an arbitration agreement's existence is evidentiary and runs with the party seeking to compel arbitration. *United Rentals, Inc. v. Smith*, 445 S.W.3d 808, 812 (Tex.App.--El Paso 2014, no pet.). Whether the parties agreed to be bound to an arbitration agreement is a contract formation question we review *de novo*, deferring to the trial court's findings of historical fact as between the parties so long as those determinations are supported by legally sufficient evidence. *Kmart Stores of Tex., L.L.C. v. Ramirez*, 510 S.W.3d 559, 565 (Tex.App.--El Paso 2016, pet. denied). The fact that a party has signed a contract creates a strong presumption that the party has assented to the terms of the contract. *Wright v. Hernandez*, 469 S.W.3d 744, 757 (Tex.App.--El Paso 2015, no pet.); *cf.* TEX.R.CIV.P. 93(7)(a party challenging the authenticity of a signature on document that was apparently signed by party must file a verified pleading as contest prerequisite).

Once the party moving for arbitration has offered prima facie evidence of an arbitration agreement's existence, the burden shifts to the party contesting the existence of an arbitration agreement to provide arguments and evidence as to why the arbitration agreement has a formation defect so as to create a triable issue that would defeat summary disposition. *See Kmart*, 510

9

S.W.3d at 565 (where employer provided evidence that employee had logged on to computer and received notice of arbitration agreement, employee bore burden of raising a fact issue contesting formation, which she met by filing a sworn denial of notice). Likewise, a party that seeks to raise an affirmative defense to an otherwise valid arbitration agreement bears the burden to provide argument and evidence in support of their claim. *Delfingen US-Tex., L.P.*, 407 S.W.3d at 797.

The scope of this Court's review of the trial court's decision is constrained by the arguments raised by the parties both in the trial court and on appeal. This Court reviews the trial court's decision denying a motion to compel arbitration in light of the grounds presented in the trial court by the party resisting arbitration. *Cardwell v. Whataburger Rests., L.L.C.*, 484 S.W.3d 426, 428 (Tex. 2016). Because the trial court would err if it denied a motion to compel arbitration on a ground not raised by the resisting party, we may affirm the trial court's refusal to compel arbitration only if one of the grounds presented by the resisting party is valid. *ReadyOne Indus., Inc. v. Flores*, 460 S.W.3d 656, 663 (Tex.App--El Paso 2014, pet. denied); *Amateur Athletic Union of the U.S., Inc. v. Bray*, 499 S.W.3d 96, 102 (Tex.App.--San Antonio 2016, no pet.)(reviewing court will uphold ruling if there is a sufficient basis under any legal theory asserted in the trial court).

### A.

#### *Arbitrability*

The arbitration agreement at issue contains a broadly-worded delegation clause giving the arbitrator the power to rule on certain aspects of the contract that would ordinarily be resolved by the trial court. Thus, before we can address the merits of the parties' arguments, we must first decide the threshold issue of whether the *trial court* could have properly addressed the merits of the parties' arguments.

The Federal Arbitration Act (FAA) provides that a "written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C.A. § 2 (West 2009). While contract interpretation issues are generally a matter of state law under the Federal Arbitration Act, the United States Supreme Court in 1967 found that this section of the FAA imposed a legal fiction known as the separability doctrine into the contract construction analysis in cases where an arbitration agreement appears as part of a larger contract rather than as a separate standalone document. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 397–98, 406, 87 S.Ct. 1801, 1802, 1807, 18 L.Ed.2d 1270 (1967).

The separability doctrine states that when arbitration clauses appear in the context of a larger contract—often referred to as a "container contract"—the arbitration clauses should be dealt with as though they are separate from the remainder of the agreement. *Id.*; *see also Venture Cotton Co-op v. Freeman*, 435 S.W.3d 222, 232 (Tex. 2014)(referring to the non-arbitration provisions of an agreement as the "container contract"). As a result, an arbitration clause, read in isolation, may properly delegate the resolution of certain so-called gateway issues relating to the validity of the container contract at large to an arbitrator when ordinarily, a trial court would be the proper forum for deciding contract validity issues. Indeed, this Court has previously recognized that if a contract's arbitration clauses "sweeps broadly enough to subsume gateway issues [regarding contract validity] into an arbitral dispute, and there is evidence that both parties agreed to the covenants, then the trial court should compel arbitration and leave issues of validity and enforceability to the arbitrator." *Lucchese Boot Co. v. Licon*, 473 S.W.3d 390, 397 (Tex.App.--El Paso 2015, no pet.). The questions of what issues may be delegated to an arbitrator and how the

11

parties must draft an arbitration clause that accomplishes the goal of submitting contract validity issues to the arbitrator are not always straightforward, but *Prima Paint* and subsequent cases help establish the framework we must use.

Building off of the separability doctrine, the Court in *Prima Paint* held that in cases that involve gateway-issue arbitration clauses in container contracts that have unquestionably formed as a matter of state law, a federal district court could only entertain challenges aimed at the validity of the arbitration clauses themselves. *Prima Paint Corp.*, 388 U.S. at 403-404, 18 L.Ed.2d at 1805-06. Any attacks on or defenses against the enforcement of the container contract at large were matters to be resolved by an arbitrator. *Id.* This principle was later incorporated against the States, *see Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445–46, 126 S.Ct. 1204, 1208-09, 163 L.Ed.2d 1038 (2006), and the Texas Supreme Court adopted it as a matter of state law in *In re Morgan Stanley & Co., Inc.*, 293 S.W.3d 182, 187-88 (Tex. 2009)(orig. proceeding). The *In re Morgan Stanley* case drew a distinction between contract formation issues and contract validity issues. *Id.* Contract formation issues are the sole province on the trial court. Without a predicate, properly formed contract, there can be no arbitration. Contract *validity* issues, on the other hand, may be decided by the trial court if they are aimed at the arbitration provisions viewed separately from the remainder of the document, while contract validity issues that deal with the container contract as a whole are for the arbitrator.

In light of *Prima Paint* and *In re Morgan Stanley*, we believe arbitrability can best be conceptualized as a three-step inquiry:

- *Step #1: Did a contract form?* The trial court has the authority to decide the threshold question of whether a contract ever formed in fact. "'Parties form a binding contract when the following elements are present: (i) an offer; (ii) an acceptance in strict compliance with the terms of the offer; (iii) a meeting of the minds; (iv) each party's consent to the terms; and (v) execution and delivery of the contract with the intent that it be mutual and binding.'" *Karns v. Jalapeno Tree*

12

*Holdings, L.L.C.*, 459 S.W.3d 683, 692 (Tex.App.--El Paso 2015, pet. denied). Conceivably, the trial court retains the authority to decide predicate issues related to these five elements of contract formation, even if the arbitration agreement delegates gateway issues to the arbitrator, as parties cannot as a matter of law delegate the issue of whether the contract formed to the arbitrator.

- ***Step #2: Do the arbitration covenants in a validly formed contract delegate contract validity issues to the arbitrator?*** If there is prima facie evidence that a contract formed, the scope of the arbitration clauses' sweep will determine which issues are arbitrable and which are not. The trial court will presumptively retain the power to rule on gateway contract validity issues unless there is "clear, explicit evidence to the contrary." *See Luchese Boot Co.*, 473 S.W.3d at 399 (finding that the delegation of certain claims to an arbitrator and the reservation of certain claims for the trial court did not evince an intent to submit gateway claims related to the container contract to arbitration).

- ***Step #3: If the arbitration clause delegates contract validity questions to the arbitrator, is the party resisting arbitration levelling complaints about the validity of the arbitration clause specifically, or the validity of the container contract as a whole?*** If the arbitration clauses purport to sweep broadly enough to subsume even contract validity issues into the arbitral forum—for example, by using language stating that arbitration will be required for "*all* disputes between an employer and employee" or "'[a]ny claim, dispute or other matter in question arising out of or related to the contract'"—then the presumption against the trial court retaining the ability to decide gateway issues is overcome. *Luchese Boot Co.*, 473 S.W.3d at 398 (citing examples of broad-form arbitration clauses that did result in delegation of contract issues to the arbitrator). At that point, the distinction made in *Prima Paint* applies. Issues regarding the validity of the container contract will be decided by the arbitrator, whereas issues regarding the validity of the arbitration clauses themselves must be decided by the trial court.

**1.**

**Step One: Did a Contract Form?**

*Double Eagle Failed to Raise a Contract Formation Challenge*

The first step of our *Prima Paint* inquiry requires us to look at the nature of the challenge to the contract to see if the party resisting arbitration brought a contract *formation* challenge. If so, the trial court has the authority to resolve that issue first before resolving the scope of arbitrability.

Here, Ridge offered the signed lease agreement with the arbitration clause into evidence.

Double Eagle did not contest its authenticity, and at the hearing went so far as to concede that the McDaniels were not "forced" to sign the agreement. The presence of a signature is strong evidence that the parties assented to an agreement. *Wright*, 469 S.W.3d at 757. The signed container contract sets out the terms of the underlying transaction, and the arbitration clause evinces a mutual intent to arbitrate. As such, we find that there is prima facie evidence of formation, and the burden shifts to Double Eagle to bring forth arguments or evidence that would undermine contract formation. *See Kmart*, 510 S.W.3d at 565.

Relying on passing remarks that Double Eagle made in the trial court and again in its appellate brief, the dissent would find that Double Eagle raised a contract formation challenge that would allow this Court to bypass the arbitrability problem, address an interpretational issue on the merits, and use the interpretational issue to affirm the trial court's decision to deny the motion to compel arbitration on that ground. Specifically, the dissent believes that because the arbitration clause identifies two arbitration administrators (AAA in one section, JAMS in another) and two sets of arbitral procedural rules (AAA rules in one section, JAMS rules in another), it is apparent that the parties failed to meet minds as to the identity of the arbitrator and the set of rules to be used in arbitration. And because these terms are material in the dissent's eyes, the lack of agreement here is fatal; a valid arbitration agreement never formed.

We respectfully disagree. We discern no contract formation challenge on this record, and we do not believe that we are within our power to address the effect of the ambiguities for two reasons. First, counsel never actually challenged the arbitration agreement on formation grounds in the trial court, and even under a liberal view of the record, counsel's stray references to ambiguity in pleadings and oral argument at the hearing cannot be expanded to embrace a formation challenge that is cognizable on appeal. Second, even if Double Eagle properly presented

14

the argument in the trial court, it did not sufficiently develop the argument on appeal so as to assign this matter as a basis for affirming the trial court's decision.

*i.*

*Double Eagle's Appellate Argument Does Not Comport with Its Argument in the Trial Court*

"As a prerequisite to presenting a complaint for appellate review, the record must show that . . . the complaint was made to the trial court . . . ." TEX.R.APP.P. 33.1. The parties are restricted in the appellate court to the theory on which the case was tried in the lower court. *Hamrick v. Ward*, 446 S.W.3d 377, 386 (Tex. 2014). "Complaints and arguments on appeal must correspond with the complaint made at the trial court level." *Knapp v. Wilson N. Jones Mem'l Hosp.*, 281 S.W.3d 163, 170 (Tex.App.--Dallas 2009, no pet.). It is improper to enlarge a ground of error or expand an issue on appeal to encompass matters that were not before the trial court. *In re J.D.D.*, 242 S.W.3d 916, 920 (Tex.App.--Dallas 2008, pet. denied); *In re Marriage of Lendman*, 170 S.W.3d 894, 898-99 (Tex.App.--Texarkana 2005, no pet.).

The dissent first maintains that because Ridge bore the burden to show the existence of an arbitration agreement as the party moving to arbitrate, Ridge also bore the burden to explain away the ambiguity as part of its case-in-chief before the trial court. Since Ridge failed to address the ambiguity, the trial court could have found that Ridge failed to prove the necessary element of meeting of the minds, meaning that the trial court's order denying a motion to compel could have properly rested on that ground. We disagree. This approach misapplies the burden-shifting framework we articulated in *United Rentals* and *Kmart*.

The initial *evidentiary* burden for proving the existence of an arbitration agreement runs with the movant. *United Rentals*, 445 S.W.3d at 812. This evidentiary burden encompasses threshold evidentiary issues such as authenticity and evidence of mutual assent. So, for example,

15

if the movant cannot authenticate an agreement before the trial court, then it has not met its threshold evidentiary burden. *See id*. at 814 (movant failed to prove prima facie case because the authenticating affidavit did not certify that the attached agreement was a true and correct copy or that it was complete). But if the movant can furnish more than a scintilla of evidence showing the non-movant's assent, the burden shifts to the non-movant to create a fact issue or else to raise technical legal arguments as to why the agreement fails despite the non-movant's apparent assent. *Kmart*, 510 S.W.3d at 568-69 (affidavit from human resources officer that employee's login credentials were used to access arbitration agreement constituted prima facie evidence of notice, which shifted burden to employee to create fact issue).

Mutual promises to arbitrate claims provide sufficient consideration to support an arbitration agreement. *In re 24R, Inc.*, 324 S.W.3d 564, 566 (Tex. 2010)(orig. proceeding). And the uncontested existence of the non-movant's signature on an arbitration agreement meets the evidentiary standard necessary to prove the prima facie existence of an arbitration agreement. *See id*. (noting that the arbitration agreement was signed by both parties and shifting its analysis to the non-movant's technical defect arguments regarding illusory promises); *Wright*, 469 S.W.3d at 757 (party's signature on contract creates a "strong presumption" that the party assented to the contract). Here, although the identity of the arbitration administrator and the rules of arbitration are conflicting, the presence of the arbitration clause in the lease constitutes sufficient consideration to undergird an arbitration agreement. And the McDaniels' signature on the lease is strong evidence that the McDaniels accepted Ridge's offer, and that they therefore concluded negotiations, met minds, and agreed to be bound. *Cf. Jalapeno Tree Holdings*, *L.L.C.*, 459 S.W.3d at 692 (although meeting of the minds is treated as a distinct element, it is actually a component of offer and acceptance); *Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846

(Tex. 2000)(a contract fails on meeting of the minds indefiniteness grounds when its material terms are left open for further negotiation). Ridge made its prima facie case by furnishing a signed arbitration agreement, and Double Eagle never contested authenticity and assent-in-fact. The burden shifted to Double Eagle to provide a reason why the arbitration agreement was defective. Consequently, we can only affirm the trial court's judgment on a contract malformation ground if Double Eagle actually advanced a contract malformation ground in resisting arbitration in the trial court. *Bray*, 499 S.W.3d at 102 (affirmation of denial appropriate only on those grounds advanced in the trial court).

This dissent next maintains that even if the burden was on Double Eagle, this Court can entertain appellate argument related to contract malformation because Double Eagle "indirectly" alerted the trial court to the contract malformation issue by referring to the arbitration clause's ambiguous and conflicting terms in its pleadings and at the motion to compel hearing. We do not find Double Eagle's fleeting references to the ambiguity to be enough to place the issue of contract malformation before the trial court.

When Ridge sought to enforce a purported arbitration agreement, Double Eagle, in its Plaintiff's Response to Defendant's Motion to Stay and Motion to Compel Alternative Dispute Resolution, resisted on three grounds only: (1) "The arbitration agreement is unconscionable and unenforceable" (Section II.A); (2) "Defendants waived their right to arbitration by substantially invoking the judicial process to Double Eagle's detriment" (Section II.B); and (3) "Double Eagle's fraud and conspiracy claims are not within the scope of the arbitration agreement and are not arbitrable" (Section II.C). None of these three defensive grounds asserted by Double Eagle in the trial court ever raised any formation issues; rather, they raised only affirmative defenses to enforcement (ground one and two) and interpretational issues (ground three). And while we look

17

to the content of the argument in a pleading and not just the subject headings in deciding what issues were before the trial court, Double Eagle only mentioned the ambiguity in passing twice.

First, Double Eagle mentioned the ambiguity in the Background portion of factual recitals when it characterized the arbitration clause as being "ambiguous, onerous, and internally inconsistent[.]" The ambiguity is also mentioned in passing in Double Eagle's response as part of an argument Double Eagle makes about Ridge having waived the right to arbitrate by substantially invoking the judicial process. Specifically, Double Eagle complained that it would be prejudiced by discovery limitations in the arbitral forum, regardless of whether the case was sent to AAA or JAMS:

> 23. Third, much of the discovery already done in the litigation (and necessary discovery to be done) may have been unavailable in the arbitration. The arbitration clause is ambiguous as to whether the arbitration should be conducted under the rules of the American Arbitration Association or JAMS. It says both that the arbitration shall be 'administered by the American Arbitration Association in accordance with its commercial arbitration rules pursuant to the Texas General Arbitration Act' and that '[t]he arbitration shall be administered by JAMS pursuant to its Comprehensive Arbitration Rules and Procedures in accordance with the Expedited Procedures in those Rules.'

> 24. No matter which rules apply, however, discovery that is permitted under the Texas rules and that Double Eagle has requested and will request may not be available in arbitration. For example, Double Eagle may not be able to obtain documents it requested in arbitration. In the litigation, Double Eagle has already requested (and Defendants already responded to) 28 document requests. Such requests are of course permitted under the Texas rules. . . . But the exchange of documents and document requests is completely discretionary under the AAA commercial rules. . . . And the JAMS rules are more restrictive than the Texas rules on document requests.

Although Double Eagle mentioned the ambiguity, Double Eagle never once argued in its pleading that the ambiguity dealt with material terms or that the conflicting provisions otherwise invalidated the arbitration agreement. The reference to ambiguity occurred in a discussion of prejudice resulting from a purported waiver of the right to arbitrate, and even then, it appeared

18

only in the context of a general complaint about how the arbitration rules would not provide Double Eagle with as much discovery as the Texas Rules of Civil Procedure. The gulf between this argument and the argument advanced on appeal regarding contract malformation based on a lack of a meeting of the minds is too wide to be bridged. The conceptual connection between the trial argument and the appellate argument is simply not there.

Counsel's arguments during the *Tipps* hearing were also not enough to alert the trial court about any potential contract malformation issues. At the hearing, counsel for Double Eagle focused his argument heavily on the subjects of fraudulent inducement and unconscionability. Counsel did comment briefly on the arbitration administrator discrepancy midway through argument:

> There are some interesting features, if you look through this, on slide number 7. At one point the arbitration clause says that it's administered by the American Arbitration Association, or AAA. At another point it says it should be administered by JAMS.

Beyond this comment that the ambiguity was "interesting," counsel never again returned to the issue of the arbitrator's identity. Apart from using the poor draftsmanship of the arbitration agreement to make a brief rhetorical point to the trial court, the *legal* effect of these conflicting provisions was never discussed at all. Instead, Double Eagle focused its argument on the inherent unfairness of the transaction as a whole from a substantive and procedural standpoint, repeatedly arguing that the McDaniels transaction was a "scam" and a "bait and switch" that resulted in the transfer of an oil-and-gas interest for below-market value. While that argument does embrace fraud-based or unconscionability-type challenges to the arbitration agreement, it does not subsume a meeting-of-the-minds or formation argument.

The dissent correctly notes that the trial court can *sua sponte* find a contract to be ambiguous, and it points out that the ambiguity as to the identity of the arbitrator and the procedural

19

rules to be used at arbitration is patent[4] and obvious.  As such, the dissent maintains that the level of detail Double Eagle needed to use to alert the trial court to this issue was not high, since the ambiguity necessarily shows a lack of meeting of the minds on the agreement's face that would have been obvious to the trial court.  We agree that this ambiguity is troubling as an *interpretational matter*, but we disagree with the dissent's premise that a patent ambiguity necessarily kills a contract for all intents and purposes.

The failure to meet minds on a term of the contract is only fatal to a contract if the term was essential or material.  And a term is essential or material only if it is "vitally important" to the bargain.  *Burrus v. Reyes*, 516 S.W.3d 170, 187 (Tex.App.--El Paso 2017, pet. denied).  Thus, the presence of an ambiguity in a contract does not always indicate a structural failure; it could just as easily mean that the parties intended to be bound to arbitrate and that the trial court, as the outside interpreter of the contract, should admit parol evidence to shed light on that contract's limits.  *See Jalapeno Tree Holdings, L.L.C.,* 459 S.W.3d at 690 (intent to be bound may be a question of fact or of law depending on the circumstances); *Burlington Res. Oil & Gas Co., L.P. v. Petromax Op. Co., Inc.*, 486 S.W.3d 703, 712 (Tex.App.--Texarkana 2016, no pet.)(court's duty in the face of an ambiguous contract is to determine the true intention of the parties, which is a fact question that may be answered through the admission of extrinsic evidence).

Legal argument is needed to determine whether this ambiguity is fatal to the entire contract or an interpretational bump in the road.  Legal argument related to that distinction is what is lacking on this record.  And the lack of legal argument in the trial court on that specific point ties our hands

---

[4] An ambiguity in a contract may be said to be "patent" or "latent." A patent ambiguity is evident on the face of the contract. A latent ambiguity arises when a contract which is unambiguous on its face is applied to the subject matter with which it deals and an ambiguity appears by reason of some collateral matter. For example, if a contract called for goods to be delivered to "the green house on Pecan Street," and there were in fact two green houses on the street, it would be latently ambiguous. *See Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*, 907 S.W.2d 517, 520 & n.4 (Tex. 1995).

on appeal and prevents us from addressing the merits of this specific controversy. A complaint must be made with sufficient specificity before it is considered to be before the trial court. TEX.R.APP.P. 33.1. We cannot conclude that Double Eagle raised the issue of contract malformation based on a meeting-of-the-minds failure with sufficient specificity so as to alert the trial court and opposing counsel that this was a basis for resisting arbitration. Consequently, we cannot entertain Double Eagle's arguments related to formation problems on appeal because formation arguments were never advanced by Double Eagle in the trial court as a basis for denying a motion to compel arbitration. The appellate argument does not comport with the trial argument.

*ii.*

*Double Eagle Did Not Properly Assign This Issue for Our Review*

There is a second reason militating against our discussion of this issue on the merits: Double Eagle failed to develop this issue fully in its appellate brief. "Our power of review in civil cases is constrained by what arguments appear in the parties' briefs." *Hogg v. Lynch, Chappell & Alsup, P.C.*, ---S.W.l3d ---, 2018 WL 2077668, at *4 (Tex.App.--El Paso May 4, 2018, no pet.). Failure to meet briefing standards may result in a court of appeals not reaching a particular issue. *Id*. We have no duty to perform an independent review of the record and applicable law to determine whether there was error. *Arellano v. Magana*, 315 S.W.3d 576, 577 (Tex.App.--El Paso 2010, no pet.).

The dissent believes that it was incumbent on Ridge, as Appellant, to address the ambiguity issue first since it could have been a basis upon which the trial court's order rested, and that, consequently, Ridge violated briefing rules by not raising the issue in its opening brief. But the reason Ridge did not raise that issue in its opening brief, as recognized by the dissent, is because "it seems that Ridge perceived Double Eagle's argument as pertaining only to unconscionability

21

claims--and therefore, not contract formation[.]" Ridge's perception of Double Eagle's argument tracks the reality of Double Eagle's argument. As we stated previously, Double Eagle did not raise the issue in the trial court with sufficient specificity to alert the trial court and Ridge that this was a basis for a challenge; it was only on appeal that Double Eagle expanded on this point.

While an appellant should negate every potential basis for a trial court's ruling, we note that Double Eagle did not object to a briefing rule violation or ask us to affirm the trial court's decision by default based on a briefing rule violation. Instead, Double Eagle, like Ridge, focused the bulk of its argument on the issue of unconscionability, reserving its discussion of the ambiguity issue as an alternative argument dealt with in two sentences. This is likely because both parties understood that the ambiguity issue, to the extent it loomed in the background, was ancillary. We should take our lead from the parties and focus our attention on the controversy as they have presented it, rather than discussing a side issue at length and treating it as potentially dispositive when the level of detail that both parties dedicate to this issue, both in their briefs and at oral arguments, suggests that the parties did not view this issue as being particularly worthy of discussion. "It is not the job of this Court to connect unrelated dots, hunt down relevant authority, or speculate as to what exactly it is a party is attempting to argue or what relief it is requesting." *Brazos Elec. Power Coop., Inc. v. Texas Comm'n on Envt'l Quality*, 538 S.W.3d 666, 700 (Tex.App.--El Paso 2017, pet. filed). "Doing so would risk placing this Court in the position of having to guess what a litigant means, or worse—inadvertently becoming an advocate for a party as the Court attempts to fill in the blanks." *Id*.

Moreover, it is equally true under the briefing rules that if the party that convinced the trial court to deny a motion to compel arbitration files a brief as an appellee and fails to sufficiently re-urge a ground on appeal, the appellate court can treat that ground as having been abandoned as a

22

basis for affirmation on appeal. *See Whataburger Rest., L.L.C. v. Cardwell*, 545 S.W.3d 73, 79 (Tex.App.--El Paso 2017, no pet.)(appellee's failure to re-urge potential ground for trial court's order denying arbitration resulted in court of appeal's inability to affirm trial court's order on that ground); *Ranchers & Farmers Mut. Ins. Co. v. Stahlecker*, No. 09-10-00286-CV, 2010 WL 4354020, at *6 n.5 (Tex.App.--Beaumont Nov. 4, 2010, no pet.)(mem. op.)(prevailing party can abandon ground advanced in trial court as a basis for affirming the trial court's denial order on appeal); *cf. Gonzalez v. Green Tree Serv., L.L.C.*, No. 14-15-01076-CV, 2016 WL 7401929, at *3 (Tex.App.--Houston [14th Dist.] Dec. 20, 2016, no pet.)(mem. op.)(summary judgment winner/appellee's failure to adequately brief argument related to a potential summary judgment ground advanced in the trial court waived appellate court's ability to affirm summary judgment on that ground). We believe that is what has happened here.

We have a duty to construe briefs liberally. But that duty does not extend toward making every possible argument for litigants, nor does it require this Court to address under-briefed arguments. If an issue is not fully fleshed out in a brief, then it has not been assigned for our review, and we should not resolve a case on an unassigned issue. While Double Eagle did mention the ambiguity issue in three sentences in its brief,[5] "[s]imply mentioning an issue in passing is not

---

[5] Double Eagle's brief on this issue states:

> The arbitration provision is also substantively unconscionable because it is ambiguous and inconsistent with respect to which rules will govern the arbitration. [Citation to conflicting language]. This inconsistency renders the provision unconscionable and unenforceable. [Citation omitted] Alternatively, the parties did not reach an agreement on submitting the dispute to arbitration. *See Fort Worth Indep. Sch. Dist. v. City of Fort Worth*, 22 S.W.3d 831, 846 ('It is well settled law that when an agreement leaves material matters open for future adjustment and agreement that never occur, it is not binding upon the parties and merely constitutes an agreement to agree.'); *Flores v. Nature's Best Distrib.*, *LLC*, 212 Cal.Reptr.3d 284, 292 (Cal.Ct.App. 2016)(holding that '[w]e cannot conclude the parties reached agreement on the matter of submitting any or all of plaintiff's claims to final and binding arbitration' in part because the agreement was ambiguous regarding 'the governing rules and procedures for any such arbitration').

enough to assign that issue for our review[.]" *Hogg*, 2018 WL 2077668, at *4.[6]   And while the sentences in Double Eagle's brief are followed by citations to out-of-state authority, it is not clear to us how the out-of-state authority applies in this case, where we must apply Texas law in a factually dissimilar context. The assertion of a legal conclusion in a sentence followed by a citation to a case is not always enough to meet the briefing standard if the link between the conclusion and the case is not obvious. What is missing here is context. *See Brazos Elec.*, 538 S.W.3d at 700 (legal assertion followed by citation to legal authority not enough to meet briefing standard if linkage between assertion and authority is not apparent without context). Substantive analysis was needed to bridge the gap between the legal assertions, the out-of-state cases, and their linkage to the Texas body of law at large.

The dissent finds the link between this case and the California Court of Appeals case cited by Double Eagle, *Flores v. Nature's Best Distrib., L.L.C.*, 212 Cal.Reptr.3d 284, 292 (Cal.Ct.App. 2016)(reversing order compelling arbitration where parties *inter alia* failed to specify which set of AAA rules should be used during arbitration), to be obvious enough to place the formation issue before the Court. We do not, especially considering that (1) materiality often involves case-specific determinations that are not always easily amenable to factual analogy, *Burrus*, 516 S.W.3d at 188 (materiality of terms are determined on case-by-case basis); (2) *Flores* is ostensibly distinguishable because that case involved a meeting-of-the-minds failure based on a rules ambiguity that was combined with a lack of an employer's signature[7] and a failure to sufficiently define the scope of the arbitration agreement vis-à-vis a second collective bargaining agreement

---

[6] The dissent distinguishes *Hogg* from this case based on the fact that *Hogg* involved an appellant and argues that the briefing standard set out in *Hogg* does not apply to appellees. This is incorrect. Under the Texas Rules of Appellate Procedure, the briefing standard for appellants and appellees is the same. *See* TEX.R.APP.P. 38.2(a).

[7] Contrary to *Flores*, this Court held in *Wright* that the fact that an employer did not countersign the arbitration agreement did not stand as a bar against enforcing an arbitration agreement because the contract was not conditioned on the employer's countersignature. *Wright*, 469 S.W.3d at 757-58.

24

to show indefiniteness, whereas here the scope of the agreement is clear and the agreement was clearly consummated in all other respects, *Flores*, 212 Cal.Rptr.3d at 290-91 (identifying three reasons taken in concert); and (3) in contrast to *Flores*, which applies California law, two of our sister courts in this state, applying Texas contract law principles, have found that the identity of an arbitrator or the procedural rules to be used in the arbitral forum are not *per se* material terms. *See Bonded Builders Home Warranty Ass'n of Tex., Inc. v. Smith*, 488 S.W.3d 468, 478 (Tex.App.--Dallas 2016, no pet.)(failure to designate an arbitrator or identify procedural rules would not invalidate arbitration agreement because those terms were not material); *Goetz v. Goetz*, 130 S.W.3d 359, 362 (Tex.App.--Houston [14th Dist.] 2004, pet. denied)("the failure to identify an arbitrator, or even specify a method for choosing one, does not render an arbitration agreement unenforceably incomplete").

Indeed, although the dissent worries that the conflict in the arbitrator administration provision is fatally irreconcilable, it would appear that Congress has foreseen this exact type of situation and provided the parties with a solution to clear this logjam. Section 5 of the Federal Arbitration Act states:

> If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or . . . if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire . . . then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

9 U.S.C.A. § 5. *See also Royce Homes, L.P. v. Bates*, 315 S.W.3d 77, 87 (Tex.App.--Houston [1st Dist.] 2010, no pet.)(court may properly invoke Section 5 authority where there is a "mechanical breakdown in the arbitrator selection process"). Section 5 may provide the trial court with the

25

authority to appoint an arbitrator under these circumstances. Then again, it might not. Adequate briefing could have refined these arguments in the crucible of adversarial advocacy so that we could make a decision either way. Instead, we are left to speculate. If we must speculate as to the nature of a party's argument and stray too far into independent research ourselves in order to resolve an issue, then the issue has not been adequately briefed, and we should decline to address it, if not for fear of inadvertently becoming an advocate for the party, then at least for claims-processing purposes as the Court prioritizes its finite judicial resources in the service of arguments and debates that do not leave us guessing. *Brazos Elec.*, 538 S.W.3d at 700 (briefing rules serve important claims-processing function).

The dissent also identifies differences in the discovery procedures between AAA and JAMS based on the limited excerpted rules that appear in the record before us and asserts that these differences makes the materiality of the arbitral procedure rule selection obvious. Double Eagle never once mentioned discovery rules or used the word "discovery" in its brief. But putting that aside, again, two of our sister courts disagree with the dissent and raise colorable arguments as to why the identity of an arbitrator or the selection of arbitration rules may not always be material. *Bonded Builders*, 488 S.W.3d at 478; *Goetz*, 130 S.W.3d at 362. The fact that the two organizations may have differences in discovery procedures does not answer the question of whether the McDaniels and Ridge believed the selection of particular arbitral procedures was a material term in the bargain. Further, Double Eagle does not explain how we are to take the fact that Jolinda McDaniel, in paragraph 14 of her affidavit, makes the assertion that "[t]here were no discussions about any arbitration provision in the Royalty Leases." It is unclear as to whether McDaniel's affidavit testimony related to the negotiation or lack thereof of arbitral terms even meets the scintilla standard needed to create a fact issue on contract formation in light of the

26

presumptively valid, signed agreement. Maybe so. Maybe not. We lack briefing on that point, as well.

When it comes to the effect of these ambiguous clauses, we agree with the dissent in one key respect: the issues at play here are incredibly complex, and the implications on the question of which terms are material to an arbitration agreement and which are not is a matter of importance to the jurisprudence of this State. As such, more detailed briefing on this topic would not only have been more helpful to the Court in analyzing this issue; in our view, more briefing was *required before* the Court could analyze this issue. Discussion on this point risks the creation of an advisory opinion that does not address the controversy presented by the parties, and disposition of this point in the absence of substantial briefing is not appropriate.

For this reason, we hold that the issue of contract formation is not before this Court.

Given that Double Eagle failed to raise a meritorious contract formation challenge, the prima facie existence of the arbitration agreement is established. We turn next to the scope of the arbitrability clause.

**2.**

**Step Two: Scope of the Arbitrability Clause**

The Arbitration Clause at issue states that alternative dispute resolution procedures apply "[i]n the event of *any dispute*(s), claim or controversy arising out of or relating to this contract or the breach, termination, enforcement, *interpretation or validity thereof, including the determination of the scope or applicability of this agreement to arbitrate . . .*" [Emphasis added]. This language evinces a clear intent to delegate as many issues as permitted by law to the arbitrator.

**3.**

**Step Three: Attack on Container Contract or on Arbitration Clause?**

27

Finally, given that the delegation clause sweeps widely, we must decide whether Double Eagle's arguments against enforcement are aimed at the arbitration clause specifically, or at the container contract generally. Attacks on the arbitration clause specifically can be entertained by the trial court; general attacks against enforcement of the container contract must go to the arbitrator.

Double Eagle's remaining arguments that the Royalty Agreement is substantively and procedurally unconscionable represent affirmative defenses against the enforcement of a presumptively formed contract. *See In re FirstMerit Bank, N.A.*, 52 S.W.3d 749, 756 (Tex. 2001)(orig. proceeding). Under the *Prima Paint* framework, determining whether an affirmative defense, including unconscionability, constitutes a valid ground for non-enforcement of the container contract is a matter for the arbitrator, not the trial court. *Id.*; *Universal Computer Consulting Holding, Inc. v. Hillcrest Ford Lincoln-Mercury, Inc.*, Nos. 14-04-00819-CV, 14-04-01103-CV, 2005 WL 2149508, at *2 (Tex.App.--Houston [14th Dist.] 2005, orig. proceeding)(mem. op.).

As a preliminary matter, Double Eagle contends that its substantive and procedural unconscionability arguments were aimed at the arbitration provisions individually rather than the contract as a whole. We agree, but only in part.

Double Eagle's substantive unconscionability arguments do target certain aspects of the arbitration clauses themselves. For example, Double Eagle asserts that (1) the arbitration clauses' prohibition on exemplary damages is substantively unconscionable because it eliminates a statutorily available remedy and is thus against public policy; (2) the forum selection provision of the arbitration clauses is substantively unconscionable; and (3) the arbitration provision is substantively unconscionable because it is "inconsistent and ambiguous" regarding "governing

28

rules and procedures." Because Double Eagle's substantive unconscionability complaints go directly towards the arbitration provisions as opposed to the container contract, the trial court could properly entertain those challenges itself under *Prima Paint*.

The same cannot be said for Double Eagle's procedural unconscionability arguments. Although Double Eagle frames its appellate argument as an attack on the arbitration clauses, the actual substance of the argument deals with the circumstances surrounding the negotiation and signing of the container contract as a whole. There is no discussion of the arbitration clauses individually or the process surrounding their adoption separate and apart from the negotiation of the container contract as a whole. Double Eagle's argument that the presence of an arbitration agreement inside an oil-and-gas contract is unusual enough *per se* to merit trial court review is inconsistent with *Prima Paint*. Double Eagle's arguments in resisting arbitration on procedural unconscionability grounds attacked the container contract as a whole, and attacks on the container contract as a whole are matters that must be presented to the arbitrator per the terms of the arbitration clause.

As a fallback position, Double Eagle maintains that there is an exception to the *Prima Paint* rule that allows the trial court to consider and adjudicate fraud-based attacks on the container contract when the presence of arbitration clauses inside the container contract is an inherent part of a fraudulent scheme underpinning the entire contract. As authority for this proposition, Double Eagle cites *Moseley v. Electronic & Missile Facilities, Inc.*, a United States Supreme Court case decided four years prior to *Prima Paint*. *See* 374 U.S. 167, 170, 83 S.Ct. 1815, 1817, 10 L.Ed.2d 818 (1963). In *Moseley*, the petitioner alleged "that the subcontracts with him, as well as other subcontractors, were a fraudulent scheme to obtain a great amount of work and material from petition and the other subcontracts without making payment therfor and to 'browbeat' petitioner

29

and his fellow subcontractors into accepting much less than the value of their claims." *Id*. at 171, 83 S.Ct. at 1817. The insertion of an arbitration clause into the agreement was alleged to be part of the fraudulent scheme. The United States Supreme Court, in remanding the case, declined to pass on the arbitrability issue, opining that if the trial court found there was fraud, the arbitration clause contained in the contract would also fail. *Id*.

*Prima Paint* also involved a litigant who alleged fraud in the inducement of a contract containing an arbitration clause. But in that case, the United States Supreme Court held that the agreement could still be sent to an arbitrator because the litigant raised a fraud defense to the container contract, not to the separately considered arbitration agreement. In a footnote, the Court in *Prima Paint* asserted that its decision in that case was entirely consistent with *Moseley*. *See Prima Paint Corp.*, 388 U.S. at 404 n.12, 18 L.Ed.2d at 1806 n.12. The problem is that in the years since *Prima Paint* was decided, nearly every court to address this specific issue has disagreed, finding that *Prima Paint* and *Moseley* are essentially irreconcilable. *See Arnold v. Arnold Corp.-Printed Communications for Business*, 920 F.2d 1269, 1280-81 (6th Cir. 1990)(allegation that arbitration clause is part of a broader fraudulent scheme, "without more, is no longer sufficient to overcome the strong federal policy is favor of arbitration"); *Haynsworth v. The Corporation*, 121 F.3d 956, 970 (5th Cir. 1997)(holding that *Moseley*, consistent with *Prima Paint*, involved an attack on the arbitration clause specifically and not the container contract); *cf. Campaniello Imps., Ltd. v. Saporiti Italia S.p.A.*, 117 F.3d 665, 667-68 (2d Cir. 1997)(interpreting *Prima Paint* and *Moseley* harmonically to involve "some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular in order to protect the obvious distinction . . . between the arbitrability of fraud relating to a contract generally and fraud in the inducement of the arbitration clause in particular").

30

We, too, find the cases irreconcilable, and since *Prima Paint* came after *Moseley*, we agree with other courts in finding that *Prima Paint* overruled *Moseley* and established the standard we must use in cases regarding fraud with container contracts. Since Double Eagle's procedural unconscionability arguments go to the container contract as a whole, we cannot consider them; those are matters for the arbitrator.

In short, the trial court could have entertained substantive unconscionability as a ground for its ruling, but under these facts, the trial did not have the authority to enter an order that relied on any alleged procedural unconscionability of the container contract as a basis for denying a motion to compel arbitration. If we were to uphold this order, we could only do so if the substantive unconscionability ground is sufficient on the merits to justify the trial court's order denying the motion to compel arbitration. We discuss the merits of the unconscionability point below.

### B.

### *Unconscionability*

Texas recognizes both procedural and substantive unconscionability as defenses against contract enforcement. *Hogg*, 2018 WL 2077668, at \*11. "Substantive unconscionability refers to the inherent unfairness of a particular contract or provision; procedural unconscionability deals with the circumstances surrounding a contract's adoption." *Id*. Unconscionability has no precise legal definition, but is instead a totality-of-the-circumstances determination made in light of various factors we will discuss in greater detail below. *Delfingen US-Tex., L.P.*, 407 S.W.3d at 798. In assessing whether a contract generally is unconscionable under the totality of the circumstances, we consider: (1) the entire atmosphere in which the agreement was made; (2) the alternatives, if any, available to the parties at the time the contract was made; (3) the non-

31

bargaining ability of one party; (4) whether the contract was illegal or against public policy; and (5) whether the contract is oppressive or unreasonable. *Id.* The first three factors go toward the issue of procedural unconscionability; the last two factors go to the issue of substantive unconscionability.

The Texas Supreme Court has held that the State has a "public policy strongly favoring the freedom of parties to contract." *BMG Direct Marketing, Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005). "But this notion that parties are free to negotiate their own bargains conflicts with the equally compelling notion that grossly unfair bargains should not be enforced." *Venture Cotton Co-op. v. Freeman*, 435 S.W.3d 222, 228 (Tex. 2014). The defense of unconscionability balances these competing interests, but because the defense of unconscionability allows for an otherwise valid contract to go unenforced, the bar for establishing the defense is set very high. *Besteman v. Pitcock*, 272 S.W.3d 777, 789 (Tex.App.--Texarkana 2008, no pet.). The fact that a party entered into a contract that was "lawful but improvident" or that an opposing party drove a hard bargain during negotiations does not justify a finding of unconscionability. *In re Big 8 Food Stores, Ltd.*, 166 S.W.3d 869, 877 (Tex.App.--El Paso 2005, orig. proceeding). Instead, "[t]he grounds for substantive abuse must be sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural abuse—the circumstances surrounding the negotiations must be shocking." *Delfingen US-Tex., L.P.*, 407 S.W.3d at 798; *see also Besteman*, 272 S.W.3d at 789 (holding that an unconscionability finding is appropriate only "where the inequity of the term is so extreme as to shock the conscience").

## 1.

### Procedural Unconscionability

As we have already stated, procedural unconscionability could not form a valid basis for

the trial court's order since that particular matter was reserved solely to the arbitrator. On appeal, we cannot affirm the trial court's order on procedural unconscionability grounds without first weaving our way past the *Prima Paint* arbitrability issue. Nevertheless, we will begin our discussion here by addressing procedural unconscionability on its merits in the event we are incorrect in our assessment that *Prima Paint* overruled *Moseley*. Even if *Moseley* remains good law and the question of procedural unconscionability vis-à-vis the container contract was properly before the trial court because it involved an overarching allegation of fraud, Double Eagle failed to prove procedural unconscionability on the record before us. Thus, whether we dispose of the procedural unconscionability arguments on arbitrability grounds or on the merits, the path we take is immaterial because our ultimate conclusion remains the same: procedural unconscionability could not form a valid basis for the trial court's decision.

This Court has repeatedly made clear that although most motions to compel arbitration are decided summarily by affidavits and deposition testimony, arbitration cases also involve more than simply handing an arbitration agreement to the trial court and asking for enforcement, or filing a defensive pleading with the trial court asserting affirmative defenses to enforcement supported only by bare allegations. "The burden of establishing an arbitration agreement's existence is evidentiary and runs with the party seeking to compel arbitration." *United Rentals,* 445 S.W.3d at 812. Similarly, a party resisting arbitration by raising an affirmative defense has the burden of providing some evidence in support of its defense if it hopes to see a favorable ruling upheld on appeal. *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex.App.--Waco 2005, pet. denied). While motions can be decided on summary proceedings "on the basis of affidavits, pleadings, discovery, and stipulations" or (if the evidence is conflicting) at an evidentiary *Tipps* hearing, there must be some evidence more than a scintilla supporting the trial court's findings of historical fact,

33

and those findings of historical fact, taken together, must meet the legal standard for whatever relief the trial court grants. *See Kmart*, 510 S.W.3d at 565 (trial court could properly deny motion compelling arbitration because there was conflicting evidence as to whether the party resisting arbitration actually had received notice of the agreement).

Double Eagle makes many allegations about what happened in the negotiations between the McDaniels and Ridge, but we are bound by the standard of review to consider only those allegations supported by evidence that appears in the record. Double Eagle bore the burden of putting forth evidence supporting its affirmative defense. Here, the lack of a substantial record cuts against Double Eagle.

With respect to prong one of the three procedural unconscionability questions—the entire atmosphere in which the agreement was made—the information we have comes largely from Jolinda McDaniel's affidavit. According to that affidavit, Ridge spoke to James McDaniel about a potential agreement, and the McDaniels allegedly misunderstood the agreement and did not read the agreement before signing it. There is no evidence of pressure or coercion apparent from Jolinda McDaniel's affidavit. Instead, it appears that the McDaniels signed this agreement freely.

Double Eagle avers that the McDaniels' failure to read or understand the agreement is vitiated by affirmative misrepresentations made by Ridge during the negotiation process. As support for the proposition that Ridge's affirmative misrepresentations excuse the McDaniels from reading the agreement themselves, Double Eagle cites this Court's decision in *Delfingen US-Tex., L.P.*, 407 S.W.3d at 794-95. But the facts of *Delfingen US-Tex., L.P.* are far different from the facts in this case.

*Delfingen US-Tex., L.P.* involved a new employee that attended an employer's orientation session, which was conducted in Spanish, by the human resources representative. The employee

34

was then offered several documents to sign in English, including an arbitration agreement. The form was not made available in Spanish, and that while the HR representative translated the company's policies related to "attendance, tardiness, and punctuality in detail," the HR representative never mentioned the arbitration agreement or what it meant. *Id*. at 795. The employee was later injured on the job and sued. The employer moved to compel arbitration, and the trial court refused. We affirmed the trial court's refusal to arbitrate based on procedural unconscionability grounds.

In *ReadyOne Industries, Inc. v. Casillas*, we articulated what it was specifically about the *Delfingen US-Tex., L.P.* case that made that arbitration agreement unconscionable: "In *Delfingen*, we upheld the trial court's order refusing to compel arbitration because the evidence established the plaintiff was illiterate in English, Spanish language versions of the documents in question were not provided to the plaintiff, and, according to him, a representative of the defendant affirmatively misrepresented the contents of the arbitration agreement." *ReadyOne Indus., Inc. v. Casillas*, 487 S.W.3d 254, 262 (Tex.App.--El Paso 2015, no pet.). Thus, it was not just the employer's affirmative misrepresentation to the employee that formed the basis for upholding the motion to deny arbitration. The fact that the employee was illiterate in English and did not receive a Spanish language copy to verify that the terms of the agreement were as they were represented to be amplified the employer's misrepresentation into something procedurally unconscionable by taking advantage of the employee's illiteracy.

*Delfingen US-Tex., L.P.* does not support a finding of procedural unconscionability on these facts. As we stated in *Delfingen US-Tex., L.P.*, "[a] person who signs a contract must be held to have known what words were used in the contract and to have known their meaning, and he must be held to have known and fully comprehended the legal effect of the contract . . . [and]

35

absent proof of mental incapacity, a person who signs a contract is presumed to have read and understood the contract unless he was prevented from doing so by trick or artifice." 407 S.W.3d at 801. There is no evidence the McDaniels were mentally incompetent, and there is no evidence Ridge prevented the McDaniels from reading the contract by trick or artifice. As such, they are presumed to have understood the terms and accepted them. *Id.* We cannot now void the agreement as to the McDaniels' successor-in-interest based solely on an affidavit from Jolinda McDaniel stating that she did not read or understand the lease that she signed.

Double Eagle also complains that the Royalty Agreement is procedurally unconscionable because it does not contain a Section 5.151 disclosure. TEX.PROP.CODE ANN. § 5.151 provides, in relevant part:

> A person who mails to the owner of a mineral or royalty interest an offer to purchase only the mineral or royalty interest . . . and encloses an instrument of conveyance of only the mineral or royalty interest and a draft or other instrument, as defined in Section 3.104, Business & Commerce Code, providing for payment for that interest shall include in the offer a conspicuous statement printed in a type style that is approximately the same size as 14-point type style or larger and is in substantially the following form:
>
> BY EXECUTING AND DELIVERING THIS INSTRUMENT YOU ARE SELLING ALL OR A PORTION OF YOUR MINERAL OR ROYALTY INTEREST IN (DESCRIPTION OF PROPERTY BEING CONVEYED).

TEX.PROP.CODE ANN. § 5.151(a)(West 2014).

There are two problems with relying on Section 5.151 as a basis for finding procedural unconscionability in this case. First, the statute applies to offers sent by mail, whereas this case involves an offer sent by email, so the statute is not squarely applicable here. Second, even if Section 5.151 applied under these facts, the statute itself does not alter or supplant Texas common law on contracts. Rather, Section 5.151 creates a statutory remedy in addition to any contractual remedies a seller may already have. *See* TEX.PROP.CODE ANN. § 5.151(f)("The remedy provided

36

under this section shall be in addition to any other remedies existing under law, excluding recession or other remedies that would make the conveyance of the mineral or royalty interest void or of no force and effect."). Indeed, by the statute's own terms, the most relief a seller can get in the event the disclosure is not made is damages, not rescission of the transaction at large. TEX.PROP.CODE ANN. § 5.151(c)(providing that a plaintiff may receive the greater amount of $100 or the difference between the amount paid by the purchaser and the fair market value of the interest). Nothing about the text of this statute indicates that the Legislature intended for transactions like this one to be voidable, and nothing in the text of the statute excuses a party from his general duty under Texas contractual common law to read whatever instrument it is he is signing.

The evidence as to the other two prongs of the procedural unconscionability analysis are also not in Double Eagle's favor. Prong two deals with alternatives to making the deal, and prong three deals with the non-bargaining ability of one party. Again, the lack of a record cuts against Double Eagle here. There is no evidence as to what alternatives the McDaniels had other than sign the agreement, but they as a matter of law were free to reject the agreement and either negotiate for better terms or else entertain other offers. And while Double Eagle asserts that there was unequal bargaining power between Ridge and the McDaniels, we see nothing here but an arms-length transaction between two people who own mineral interests outright and an oil company seeking to purchase their interests. Indeed, as part of this agreement, the McDaniels not only retained 25 percent of the royalty interest, but notably, they also retained the executive right to decide who drilled on the land and the terms of the underlying drilling agreement. And assuming that the royalty interest assigned is contingent on production from an underlying lease, with the McDaniels' retained executive right came the right—though not without risk of litigation and not without cost—to theoretically execute an entirely new lease that eliminated Ridge's contingent

37

non-participating royalty interest entirely. *See, e.g., Anadarko Petroleum Corp. v. TRO-X, L.P.*, 511 S.W.3d 778, 784 n.7 (Tex.App.--El Paso 2016), *aff'd,* 548 S.W.3d 458 (Tex. 2018)(contingent interest holder lost contingent interest when lessor and sub-lessee holding the right to produce executed a new lease that terminated the original lease and thereby cut out the interests of contingent beneficiaries). Finally, unlike *Delfingen US-Tex., L.P.*, this case does not involve the economic pressure inherent in an employer-employee relationship.

Based on the record before us, the McDaniels received $104,000 each as a result of this deal with Ridge, and Jolinda McDaniel swore she never contacted Ridge after receiving their checks. The McDaniels then assigned their interests to Double Eagle. The decision the McDaniels made may, from the perspective of their successors-in-interest, be a bad one. But even so, the doctrine of procedural unconscionability does not empower this Court to save Double Eagle from the terms of the deal the McDaniels made simply because Double Eagle does not like the agreement's terms. For a court to intervene and nullify a contract on procedural unconscionability grounds, there must be something about the negotiation process that was not merely distasteful, but truly shocking. Nothing about Jolinda McDaniel's affidavit pushes this case over the line from the distasteful towards the shocking. All things considered, a contracting party has the duty to read or understand the agreement she is entering into. A litigant cannot meet the standard for procedural unconscionability by simply asserting that she failed to read the contract before she signed it or that she did not understand the contract she signed. Nothing about the lead-up to the agreement empowers this Court to intervene and overturn the arbitration agreement on procedural unconscionability grounds. The legal standard we set in *Delfingen US-Tex., L.P.* has not been met.

**2.**

**Substantive Unconscionability**

38

Double Eagle also urges us to affirm the trial court's order based on substantive unconscionability. Specifically, Double Eagle maintains the arbitration agreement is substantively unconscionable for three reasons: (1) it includes a prohibition on exemplary damages that is against public policy; (2) it includes a venue provision that requires arbitration to be held in San Antonio when the land at issue sits in Winkler County; and (3) the arbitration agreement has conflicting clauses governing the procedure of any arbitration. We address these issues in turn.

*a.*

*Prohibition on Exemplary Damages*

In its first defensive argument on substantive unconscionability, Double Eagle asserts that the Royalty Agreement's arbitration clause is unconscionable because the provision prohibiting the collection of exemplary damages is against public policy, as it eliminates a statutory remedy established by the Legislature and thereby cuts off statutory rights upon the transfer of the case from a judicial forum to an arbitral forum. We agree.

TEX.CIV.PRAC.&REM.CODE ANN. § 41.003(a)(1)(West 2015) provides that exemplary damages are recoverable in an action for fraud. In a recent arbitration decision, the Fourth Court of Appeals in San Antonio held that a portion of an arbitration agreement prohibiting an arbitrator from awarding punitive damages is substantively unconscionable because it "eliminates a statutory remedy that is available as a matter of public policy upon proof of malicious conduct[.]" *Amateur Athletic Union of the U.S., Inc. v. Bray*, 499 S.W.3d 96, 108-09 (Tex.App.--San Antonio 2016, no pet.). In support of its holding, the Fourth Court cited three cases: *In re Poly-America, L.P.*, 262 S.W.3d 337, 351–52, 360 (Tex. 2008), in which the Texas Supreme Court found that an arbitration agreement that eliminated reinstatement and punitive damages available under the Worker's Compensation Act was unconscionable because the remedy provisions established a "non-

39

waivable legislative system for deterrence necessary to the nondiscriminatory and effective operation of the Texas Workers' Compensation system as a whole;" *Hadnot v. Bay, Ltd.*, 344 F.3d 474, 478 (5th Cir.2003), a case in which the federal Fifth Circuit found that an arbitration provision eliminating punitive damages for Title VII claims was unconscionable because it abridged an employee's statutory rights under Title VII; and *Security Services Federal Credit Union v. Sanders*, 264 S.W.3d 292, 300–01 (Tex.App.--San Antonio 2008, no pet.), in which the Fourth Court found an arbitration agreement provision that eliminated statutory remedies available under the Deceptive Trade Practices Act to be unconscionable.

Ridge urges us not to follow *Bray* for several reasons, arguing in general that the case was wrongly decided because *Bray* applied the logic of *In re Poly-America*, *Hadnot*, and *Sanders* too broadly. Ridge argues that these cases do not apply because Double Eagle's fraud claim is not a statutory claim; rather, fraud is a common law claim and the punitive damages provision of the Texas Civil Practice and Remedies Code simply provides a statutory *remedy*. Ridge maintains these cases are the exception, not the rule, and that there is a broad rule allowing for the waiver of statutory remedies unconnected to statutorily-created claims. As proof, Ridge cites *Venture Cotton*, asserting that case abrogated or modified the holding in *In re Poly-America* so as to recognize that statutory remedies can be waived. We read *Venture Cotton* differently. In *Venture Cotton*, the Texas Supreme Court contrasted remedies under the DTPA with the Worker's Compensation Act remedies in *In re Poly-America* by noting that the DTPA, unlike the Worker's Compensation Act, *by statute* specifically allowed parties to waive certain remedies, provided a certain set of stringent procedures were met. *Venture Cotton*, 435 S.W.3d at 230. Thus, *Venture Cotton* did not hold that statutory remedies can be waived *per se*; it simply analyzed the statute to determine whether waiver of a DTPA claim was permissible. In *Venture Cotton*, the Texas

40

Supreme Court found that the DTPA statutory remedy *had not* been waived because the parties failed to strictly comply with the waiver procedure set down by statute in the DTPA. Here, Section 41.003 does not contain a waiver provision, so analogizing this case to *Venture Cotton* can only take us so far.

Ridge also maintains that the non-waivable statutory remedies involved in *In re Poly-America* and similar cases tied to statutory causes of action as part of comprehensive statutory schemes enacted by the Legislature to remedy certain issues. Thus, the enforcement of punitive damages enshrined by statute, even in an arbitral forum, was absolutely necessary to ensure the aims of the overarching statutes were reached. By contrast, Ridge says, the punitive damages provision of the Texas Civil Practice and Remedies Code—which applies generally to claims for fraud, malice, and gross negligence—is not part of an overarching statutory scheme and is not intended to achieve an overarching legislative goal and may thus be contractually waived. Ridge analogizes the punitive damages provision in Section 41.003 with the provision authorizing the collection of attorney's fees for certain kinds of cases covered by the Civil Practice and Remedies Code. Both forms of recovery are statutorily authorized by the same code, and yet parties can contractually waive any claims for attorney's fees. *See, e.g., Bank of Am., N.A. v. Hubler*, 211 S.W.3d 859, 865 (Tex.App.--Waco 2006, pet. granted, judgm't vacated w.r.m.). Why then, Ridge asks, should it be permissible for parties to waive the statutory remedy of attorney's fees and impermissible under *Bray* for parties to waive the statutory remedy of punitive damages when both forms of recovery are authorized by the same statutory code?

In the first place, while Ridge's point is well-taken, the question of waiver of the statutory remedy of attorney's fees is not before this Court, and we hesitate to render advisory opinions on issues that are not before the Court. Even so, there are strong public policy reasons for treating

41

Section 41.003 as not being waivable, and we find that the public policy reasons elucidated by the Texas Supreme Court in *In re Poly-America* and *Venture Cotton* apply with equal force here. True, the exemplary damages provision in Section 41.003 is not tied to a comprehensive statutory scheme as was the case in *In re Poly-America* (tied to the Worker's Compensation Act statutory scheme) or *Venture Cotton* (the DTPA statutory scheme). But the statutory remedy of exemplary damages in Section 41.003, much like the statutory remedies at issue in *In re Poly-America* and other cases, serves an important legislative purpose: deterrence and punishment of behavior that the legislature has identified as sanctionable.

And while freedom of contract is a paramount consideration in Texas law and parties are clearly entitled to contractually limit liability for damages stemming from a breach of contract, *see, e.g., Weaver v. Jamar*, 383 S.W.3d 805, 812 (Tex.App.--Houston [14th Dist. 2012, no pet.), breach of contract and fraud are separate causes of action, meaning that breach of contract cases cited by Ridge are not applicable here. This is especially true in light of the fact that contracting parties cannot bargain away their right to exemplary damages for a breach of contract; they have no right to recover exemplary damages for a breach of contract cause of action in the first place. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 41.003(a)(1)(providing for exemplary damages for fraud, malice, or gross negligence). We speak of a provision that deals with fraud, and we are reluctant to extend the rationale underlying the breach of contract cases to fraud cases. Doing so would allow potential fraudsters to cover their tracks by allowing them to not only force arbitration on contract validity issue when a container contract was obtained through fraudulent misrepresentations (as ostensibly required by *Prima Paint*), but also to cut off any recovery on a separately cognizable fraud claim once the case reaches the arbitral forum. And the point of arbitration is not to limit statutory remedies enacted by the Legislature for a specific public policy

42

purpose, but rather to allow a party to fully vindicate statutory rights in the arbitral forum.

We agree with our sister court and adopt *Bray*'s reasoning. The exemplary damages statute in Section 41.003 represents a measured legislative judgment and a statement of public policy aimed at enforcing the State of Texas' interest in deterring fraud, malice, and gross negligence. Unlike the DTPA, it does not contain a provision allowing parties to waive the statutory remedy. To read this provision as implicitly allowing for the waiver of a statutory remedy in the absence of a statutorily-authorized waiver procedure would undercut the Legislature's judgment and violate the logic of *Venture Cotton*.

In short, allowing for the enforcement of an exemplary damages cap in arbitration under these circumstances would contravene the public policy purpose underpinning Section 43.001 and thereby thwart the Legislature's will. That provision is substantively unconscionable and cannot go enforced.

*b.*

*Venue Provision*

We next turn to the venue provision. Double Eagle asserts that the venue provision requiring arbitration to take place in San Antonio, Texas, is unconscionable when the venue statute requires litigation in a judicial forum to take place in Winkler County. We disagree. Double Eagle has, on this record, failed to show any hardship would result from litigating the case before an arbitrator in San Antonio as opposed to litigating in Winkler County.

TEX.CIV.PRAC.&REM.CODE ANN. § 15.011 states:

> Actions for recovery of real property or an estate or interest in real property, for partition of real property, to remove encumbrances from the title to real property, for recovery of damages to real property, or to quiet title to real property shall be brought in the county in which all or a part of the property is located.

TEX.CIV.PRAC.&REM.CODE ANN. § 15.011 (West 2017).

The venue statute is not a substantive protection authorizing recovery, but is instead a procedural rule. Unlike the exemplary damages cap we discussed previous, the venue provision in the arbitration agreement does not put a substantive limit on Double Eagle's potential recovery before an arbitrator. As such, we believe the parties are free to bargain for a venue-selection clause, provided, of course, the venue-selection clause is not substantively unconscionable because it imposes hardship.

In the only case Double Eagle cites to support its contention that the venue provision here is substantively unconscionable because it will cause hardship, a federal district court in the Southern District of Texas, sitting in Houston and applying California state law under a choice of law provision in a contract, summarily found that a venue provision requiring an independent contractor to arbitrate against an employer in Palo Alto, California, was substantive unconscionable, although it did not explain why. *See Edwards v. Doordash, Inc.*, No. CV H-16-2255, 2017 WL 5514302, at \*1, \*6 (S.D.Tex. Oct. 18, 2017), *memorandum and recommendation op. adopted*, No. CV H-16-2255, 2017 WL 5514707 (S.D.Tex. Nov. 16, 2017). It is unclear how this case bears on the case here, in which we apply Texas law and the venues at issue are both located within the same state.

We find nothing substantively unconscionable about the venue provision under these circumstances.

*c.*

*Conflict on Rules Selection*

Finally, we deal with Double Eagle's assertion that the conflict in arbitral rules selection renders this arbitration agreement substantively unconscionable. As we stated previously, this issue is not sufficiently developed for us to process. Even if it were, we reiterate that the presence

44

of a patent ambiguity about procedural rules creates an interpretational issue. It is not *per se* substantively unconscionable. There is nothing in the record to indicate that this conflict in rules renders this agreement so one-sided as to shock the conscience.

*Severance*

Having determined that one provision of the arbitration agreement is substantively unconscionable, we must finally decide whether the arbitration agreement as a whole necessarily fails, or whether the offending provision can be severed out from the other arbitration clauses.

Double Eagle correctly notes that the Royalty Agreement does not have a severance clause. A severance clause is some evidence that the parties intended for a contract to survive in the event individual provisions are found to be invalid. Double Eagle also correctly observes that *In re Poly-America*, *Sanders*, and *Bray* all contained severability clauses, and those courts specifically mentioned the severability clauses in rendering their decision. *See In re Poly-America, L.P.*, 262 S.W.3d at 359 ("The arbitration agreement in this case contains a severability clause . . . ."); *Sanders*, 264 S.W.3d at 301 ("SSFCU sought enforcement of the entire general arbitration agreement, which specifically includes the above-quoted severability clause."); *Bray*, 499 S.W.3d at 101 (noting presence of a severability clause). We cannot argue that those cases relied on a severance clause as the basis for their decisions.

Double Eagle also directs our attention to the petitioners' reply brief in *Venture Cotton*, which mentions the fact that "[a]ll of the agreements also included a severability clause[.]" *See* Petitioners' Brief on the Merits at *3, *Venture Cotton*, 435 S.W.3d at 222. The Texas Supreme Court in its opinion in *Venture Cotton* did not make mention of the agreements having any severability clauses. Instead, the Court apparently relied on its inherent power to sever out clauses: "illegal or unconscionable provision of a contract may generally be severed so long as it does not

45

constitute the essential purpose of the agreement." *Venture Cotton*, 435 S.W.3d at 230; *see also*

*In re Kasschau*, 11 S.W.3d 305, 314 (Tex.App.--Houston [14th Dist.] 1999, no pet.)(severing out

illegal provisions of contract without mentioning if contract had severability clause); *Andrio v.*

*Kennedy Rig Servs.*, *L.L.C.*, No. 4:17-CV-1194, 2017 WL 6034125, at *16 n.3 (S.D.Tex. Dec. 6,

2017)(mem. op. & order)(The presence of a severance clause "sheds light on the agreement's

essential purpose" but is not necessary for severance.).  "In determining an agreement's essential

purpose, the issue is 'whether or not parties would have entered into the agreement absent the

unenforceable provisions.'"  *Venture Cotton*, 435 S.W.3d at 230; *see also Security Serv. Fed.*

*Credit Union v. Sanders*, 264 S.W.3d 292, 300 (Tex.App.--San Antonio 2008, no pet.)("Under

state-law contract principles, a court is generally authorized to sever an illegal or an unenforceable

provision from a contract and enforce the remainder of the contract.").

Although this agreement does not contain a severance clause, we exercise our inherent

power to sever out the substantively unconscionable restriction on exemplary damages.  As other

courts have found in cases involving contracts that have explicit severability clauses, severance

and not invalidation of the arbitration agreement as a whole is the appropriate remedy when faced

with an arbitration clause that has an illegal restriction on a statutory remedy.

### CONCLUSION

The arbitration agreement in this case is enforceable, save for the provision eliminating

punitive damages.  We reverse the trial court's judgment, sever out the provision prohibiting

recovery for punitive damages from the arbitration agreement, and remand with instructions to the

trial court to enter an order compelling arbitration proceedings consistent with this opinion.

August 24, 2018

YVONNE T. RODRIGUEZ, Justice

Before Rodriguez, J., Palafox, J., and Larsen, Senior Judge
Larsen, Senior Judge (Sitting by Assignment)
Palafox, J. (Dissenting)