2025 Tex. Bus. 55



The Business Court of Texas,
1st Division

PRESTON HOLLOW CAPITAL,
LLC; and PHCC LLC, *Plaintiffs*

§
§
§

v.

§ Cause No. 25-BC01B-0030

§

TRUIST BANK FORMERLY
KNOWN AS BRANCH BANK &
TRUST, *Defendants*

§
§
§
§

═══════════════════════════════════════

**OPINION REGARDING PUNITIVE DAMAGES
AND TERMINATED TRUSTEE'S DUTIES**

═══════════════════════════════════════

*Syllabus[1]*

*This opinion addresses (i) whether the Property (Trust) Code bars a trustee from enforcing a punitive damages waiver; (ii) if not, whether the waiver in one bond financing contract applies to claims based on a related contract in the same*

---

[1] *This syllabus is for the reader's convenience; it is not part of the court's opinion; and it is not legal authority.*

*financing; and (iii) whether a trustee owes continuing fiduciary duties to its beneficiaries once the trustee resigns and is replaced by a substitute trustee.*

*The court concludes that (i) the punitive damages waiver is enforceable here because the Trust Code does not reflect a legislative intent to bar such waivers; (ii) the subject waiver applies to both contracts because they are integral parts of the same financing arrangement; and (iii) a terminated and replaced trustee must protect a former beneficiary's confidential information that the trustee obtained during the trust relationship.*

## Opinion

[¶ 1]   The parties submitted these legal issues for decision using Rule of Civil Procedure 166(g):[2]

(i) Whether the punitive damages waiver in the Master Trust Indenture, Deed of Trust and Security Agreement (Master Indenture) between Senior Care Living VI, LLC and Branch Bank & Trust Company (n/k/a Truist Bank) is enforceable despite Trust Code §§ 111.0035 and 114.007;[3] if so,

(ii) does that waiver also apply to claims arising under the Trust Indenture and Security Agreement between Woodloch Health Facilities

---

[2] *See* the parties' Joint Identification of Early Legal Issues.

[3] For this opinion, the court assumes that the Texas Property Code, Title 9 (Trust Code), applies to these issues because the parties asked the court to make that assumption.  At the December 2, 2025, hearing, Truist suggested that the Trust Code might not apply because the financing arrangement is akin to an exempt deed of trust arrangement.  The court invites the parties to present a briefing schedule to address that issue.

Development Corporation and Truist (Bond Indenture), which those parties executed in connection with the Master Indenture;[4] and

(iii) does a trustee owe beneficiaries continuing fiduciary duties after the trustee resigns and is replaced by a substitute trustee.[5]

[¶ 2]  Based on plaintiffs' (Preston Hollow's) live pleadings, the parties' submissions, their arguments, and the applicable law, the court issued its December 17, 2025, Order concluding that § 114.007 does not bar the Master Indenture's punitive damages waiver, which applies to claims under both contracts.

[¶ 3]  By order dated December 9, 2025, the court limited the scope of discovery for Preston Hollow's post-termination and replacement claims that Truist used Preston Hollow's confidential information against Preston Hollow that Truist gained while serving as the bond agreement's trustee.

---

[4] The parties are familiar with the contracts at issue, so this opinion need not further define them.

[5] Preston Hollow disagrees with Truist's framing and characterization of these issues and denies that Truist prevails on them.  *See* Parties' October 24, 2025, Joint Identification of Early Legal Issues at 1 n.1.

## I. Background

[¶ 4]  The court assumes these facts alleged in Plaintiffs' Original Petition (POP) are true:

### A. The Financing

[¶ 5]  Senior Care Living VI, LLC was created to develop and operate a senior living facility called *Inspired Living at Sugar Land*.[6]  Senior Care financed the project with bond financing.[7]

[¶ 6]  Truist was the initial trustee under (i) the Master Indenture between Truist and Senior Care and (ii) the Bond Indenture between Truist and the conduit bond issuer, Woodloch Healthcare Facilities Development Corporation.[8]  The parties collectively call the Master and Bond Indentures the "Bond Documents."

[¶ 7]  Although Woodloch issued the bonds pursuant to the Bond Indenture,[9]  Senior Care was the ultimate bond Obligor.[10]

---

[6] POP ¶ 9(a).

[7] *See* POP ¶ 10(a).

[8] POP ¶ 11(b).

[9] POP ¶ 11(b).

[10] POP ¶ 12(a).

[¶ 8]  Woodloch loaned the bond proceeds to Senior Care under a loan agreement.[11]  Senior Care secured that loan with most of its assets, including the real estate, furniture and fixtures, and the project's gross receipts.[12]

[¶ 9]  Woodloch assigned its rights and interests under the Bond Documents and loan agreements to Truist.[13]

[¶ 10]  To perfect the gross revenues collateral pledge, Senior Care and Truist executed a Deposit Account and Control Agreement (DACA) and a Blocked Account Control Agreement (BACA), collectively the Account Control Agreements (ACA).[14]  Truist held all the ACA-created bank accounts, into which Senior Care had to deposit all gross receipts and gross revenue.[15]  In turn, the Bond Documents and ACA required Truist to ensure that all Blocked Account funds would be used only per Master Indenture § 3.01.[16]

[¶ 11]  Preston Hollow purchased over $21 million in senior bonds for the project and was the Series 2017A Majority Representative with authority

---

[11] POP ¶ 12(b).

[12] POP ¶ 12(c).

[13] POP ¶ 12(d).

[14] POP ¶ 12(e).

[15] POP ¶ 12(f).

[16] POP ¶ 12(g).

to exercise bondholder and Bond Trustee rights and remedies under the Bond Indenture.[17]  Preston Hollow was also the Noteholder Representative authorized to exercise certain Master Trustee rights and remedies under the Master Indenture.[18]

## B. Preston Hollow discovered Senior Care's defaults and Truist's alleged breaches.

[¶ 12]  Preston Hollow controlled the release of bond funds during construction.[19]

[¶ 13]  The project was substantially completed by late 2017, and Senior Care started leasing by early 2018.[20]

[¶ 14]  In 2019, Preston Hollow began learning of multiple Senior Care defaults[21] and directed Truist to send Senior Care default notices.[22]

[¶ 15]  When Senior Care refused to cure its defaults, Preston Hollow directed Truist to accelerate the bonds and loan,[23] which Truist did on May 31,

---

[17] POP ¶ 13(a).

[18] POP ¶ 13(a).

[19] POP ¶s 16–17.

[20] POP ¶ 18.

[21] POP ¶s 19–21.

[22] POP ¶ 22.

[23] POP ¶ 23.

2019.[24]  Preston Hollow also made demand on the loan and bond offering's guarantor for payment and collateral pledges.[25]  But the guarantor refused to comply.[26]

[¶ 16]  On July 12, 2019, Truist appointed two successor trustees.[27] Five days later, Truist resigned, saying it lacked the capacity to oversee the defaulted bonds and loans.[28]

[¶ 17]  When Truist resigned, Preston Hollow asked Truist if Senior Care had deposited its gross revenues into the Blocked Accounts as the Bond Documents and ACA required.[29]  Truist disclosed that Senior Care never did so.[30]

[¶ 18]  Preston Hollow later learned that Truist's representative previously approved Senior Care's deviation from the Bond Documents' and ACA's strict requirements.[31]

---

[24] POP ¶ 23.

[25] POP ¶ 24.

[26] POP ¶ 24.

[27] POP ¶ 25.

[28] POP ¶ 25.

[29] POP ¶ 27.

[30] POP ¶ 28.

[31] POP ¶ 29.

[¶ 19] Preston Hollow alleges that Truist committed additional fiduciary breaches following its resignation.[32]

## C. Preston Hollow's Causes of Action

[¶ 20]   Asserting essentially the same underlying misconduct, Preston Hollow alleges three causes of action against Truist: (i) breach of fiduciary duty, (ii) breach of trust, and (iii) contract breach.[33]   Preston Hollow further alleges that it suffered, and continues to suffer, unspecified damages as a direct and proximate result of Truist's breaches.[34]   Preston Hollow also seeks to recover its attorneys' fees and costs.[35]

[¶ 21]   Preston Hollow's prayer requests judgment against Truist for all damages, pre- and post-judgment interest, attorneys' fees and expenses, punitive damages, court costs, and other relief.[36]

---

[32] POP ¶s 30–34.

[33] POP ¶s 52–77.

[34] POP ¶s 60, 69, 77.

[35] POP ¶ 77.

[36] POP ¶ 60 (punitive damages for Count One: Breach of Fiduciary Duty); *id.* at Prayer.

## II. Analysis

### A. Standard of Review

[¶ 22]  Rule of Civil Procedure 166 provides that the trial court "may in its discretion" direct the parties to appear before it for a pretrial conference to consider, among other things, "[t]he identification of legal matters to be ruled on or decided by the court."[37]  Tex. R. Civ. P. 166(g).  The court "shall make an order that recites the action taken at the pretrial conference … and which limits the issues for trial to those not disposed of by admissions, agreements of counsel, or rulings of the court."  TEX. R. CIV. P. 166.  The purpose of this conference is to "assist in the disposition of the case without undue expense or burden to the parties."  *Id.*

[¶ 23]  Rule 166(g) thus "authorizes trial courts to decide matters that, though ordinarily fact questions, have become questions of law because 'reasonable minds cannot differ on the outcome.'"  *JPMorgan Chase Bank, N.A. v. Orca Assets G.P., LLC*, 546 S.W.3d 648, 653 (Tex. 2018) (quoting *Walden v. Affiliated Comput. Servs., Inc.*, 97 S.W.3d 303, 322 (Tex. App.—Houston [14th Dist.] 2003, pet. denied)).  When a Rule 166(g) order disposes

---

[37] The court copies these paragraphs twenty-two and twenty-three verbatim from *Senior Care Living, VI, LLC v. Preston Hollow Capital, LLC*, 695 S.W.3d 778, 816 (Tex. App.—1st. Dist. 2024, pet denied).

of claims in this fashion, the order is akin to a summary judgment order, and [appellate courts] review the order de novo. *Id.* If the non-movant has raised a fact issue on the claim, dismissal under Rule 166(g) is not proper. *See McCreight v. City of Cleburne,* 940 S.W.2d 285, 288 (Tex. App.—Waco 1997, writ denied); *see also King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003) (stating that more than scintilla of evidence exists to raise fact issue when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions").

## B. Rules of Contract and Statutory Construction

[¶ 24] A court's primary objective when construing contracts "is to ascertain and give effect to the parties' intent as expressed in the instrument." *U.S. Polyco, Inc. v. Texas Cent. Bus. Lines Corp.*, 681 S.W.3d 383, 387 (Tex. 2023) (quoting *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018)).

[¶ 25] Usually, courts deem the contract alone to express the parties' intent because it is objective, not subjective, intent that controls. *Id.* With unambiguous contracts, courts "can determine the parties' rights and obligations under the agreement as a matter of law." *Inwood Nat'l Bank v. Fagin*, 706 S.W.3d 342, 347 (Tex. 2025) (per curiam) (quoting *ACS Invs., Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997)).

[¶ 26]   Similarly, statutory construction's purpose is to implement the Legislature's intent by giving effect to every word, clause, and sentence. *Sunstate Equip. Co. v. Hegar*, 601 S.W.3d 685, 689–90 (Tex. 2020).  Indeed, statutory text is the "first and foremost" indication of legislative intent. *Greater Hous. P'Ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015).  Thus, courts apply the words' common, ordinary meaning unless (i) the text supplies a different meaning or (ii) the common meaning produces absurd results.  *Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 838 (Tex. 2018).

[¶ 27]   Further, courts derive statutory meaning from the entire statute. TEX. GOV'T CODE § 311.021(2); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 572 (Tex. 2016).  So, courts "presume the Legislature chose statutory language deliberately and purposefully," *Crosstex Energy Servs., L.P. v. Pro Plus, Inc.*, 430 S.W.3d 384, 390 (Tex. 2014), and that it likewise excluded language deliberately and purposefully, *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 540 (Tex. 1981).

## C. First Issue

### 1. The Issue and Short Answer

[¶ 28]   Master Indenture § 8.01(e) provides that,

In no event shall the Master Trustee be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether the Master Trustee has been advised of the likelihood such loss or damage and regardless of the form of action.[38]

[¶ 29]  The first issue is whether the Trust Code bars that punitive damages waiver. The answer is "no" because the Trust Code does not reflect a legislative intent to bar punitive damages waivers in agreements between sophisticated parties.

## 2. The Parties' Arguments

[¶ 30]  Truist posits that the punitive damages waiver is valid consideration for Truist's agreement to serve as Master Trustee.[39]  Relying primarily on *Bombardier Aerospace Corp. v. SPEP Aircraft Holdings, LLC*, 572 S.W.3d 213, 231 (Tex. 2019), Truist further argues that sophisticated parties are free to contract and that liability limitation clauses are valid limited warranties that were the basis of the parties bargain.[40]  Truist also cites

---

[38] Defendant Truist Bank's Appendix in Support of Rule 166(g) Motion for Determination of Early Legal Issues (Truist App'x.) at 84.

[39] Defendant Truist Bank's Rule 166(g) Motion for Determination of Early Legal Issues (Truist's Mot.) at 24.  This opinion does not address § 8.01(e)'s enforceability for any other purpose.

[40] Truist's Mot. 24–29.

*Bombardier* for the premise that even fraud does not automatically vitiate a liability limitation clause.[41] Thus, Truist urges that the punitive damages waiver is enforceable and precludes Preston Hollow from recovering punitive damages here.[42]

[¶ 31] Preston Hollow relies on *Mendell v. Scott*, No. 01-20-00578 2023 WL 4712050, *13 (Tex. App—1st Dist. July 25, 2023, pet. denied) to argue that Trust Code § 114.007 precludes enforcing punitive damages waivers favoring trustees where the trustee is found to have breached their duty in bad faith, intentionally, or with reckless disregard for the purpose of the trust.[43] Preston Hollow further cites *Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105, 138 (Tex. App.—8th Dist. 2018, no pet.) to assert that courts refuse to enforce contract provisions in direct conflict with statutory protections.[44]

[¶ 32] The parties did not identify any Texas cases directly on point, and this court has not found any such case.

---

[41] Truist's Mot. at 25.

[42] Truist's Mot. at 27–29.

[43] Preston Hollow's Response to Defendant's Rule 166(g) Motion for Determination of Legal Issues (Preston Hollow's Resp.) at 32.

[44] Preston Hollow's Resp. at 32.

### 3. Texas permits punitive damages exclusions in trust agreements.

#### a. *Bombardier*

[¶ 33]   Texas generally permits punitive damages waivers in negotiated contracts between sophisticated parties, at least in fraud cases.  *Bombardier*, 572 S.W.3d at 231–32 (Tex. 2019).

[¶ 34]   Specifically, *Bombardier* involved a buyer's fraud by non-disclosure claim against an aircraft manufacturer.[45]  The buyer alleged that the seller fraudulently failed to disclose negative history about an engine thereby inflating the aircraft's value.   There were two contracts at issue, and both contracts had a liability limitation clause purporting to limit the seller's liability for indirect, special, consequential damages or punitive damages for any reason.  *Id.* at 217–218.

[¶ 35]   The trial court entered judgment for the buyer based on the verdict awarding $2,694,160 in out of pocket/diminished-value damages and $5,388,320 in punitive damages.   The court of appeals affirmed that judgment.  *Id.* at 219.

---

[45] For simplicity, the court refers to multiple plaintiffs as the buyer and both defendants as the seller.

[¶ 36]   The supreme court affirmed the actual damages judgment but reversed the punitive damages judgment based on a contract liability limitation clause that precluded punitive damages.  *See id.* at 230–33.  That decision relied on (i) freedom of contract principles and (ii) that the clause did not preclude the actual damages.[46]  *Id.*

[¶ 37]   The court concluded by holding that,

> Although [seller's] conduct in failing to provide [buyers] with the new engines they bargained for was reprehensible, the parties bargained to limit punitive damages, and we must hold them to that bargain.

*Id.* at 233.  However, the court said it was not addressing the enforceability of a clause precluding punitive damages in a fiduciary context.  *Id.* 231–32.

### b. Preston Hollow's Authorities

#### i. *Mendell v. Scott*

[¶ 38]  Preston Hollow's response did not address *Bombardier*.[47] Instead, it cited *Mendell v. Scott*, No. 01-20-00578-CV, 2023 WL 4712050 (Tex. App.—1st Dist. July 25, 2023, pet. denied) for the premise that Trust Code § 114.007 prevents enforcing the Master Indenture's punitive damages

---

[46] The opinion does not discuss whether the liability limitation would apply to special or consequential damages.

[47] *See* Preston Hollow's Resp. *passim*.

exclusion for acts committed in bad faith, intentionally, or with reckless disregard for the purpose of the trust.[48] The court rejects that argument because *Mendell* did not address that issue.

[¶ 39] Instead, that court addressed § 114.007's application to an *actual* damages award where evidence supported findings that the trustee acted with malice, and thus in bad faith or intentionally. *See Mendell*, 2023 WL 4712050, at *11–14. The court explained that when a trustee invokes as an affirmative defense a clause purporting to exempt a trustee from liability for actual damages, to recover actual damages, the burden shifts to the beneficiary to prove that the trustee acted in bad faith, intentionally, or with reckless disregard for the beneficiary's interest. *Id.* So, in that context, the court concluded that,

> Thus, because there is sufficient evidence to support the jury's specific intent malice finding, and therefore an implied finding that Mendell committed a breach of trust in bad faith or intentionally, we conclude that the applicability of the exculpatory clause was not conclusively established by the evidence such that Mendell is excluded from all liability in her individual capacity.[49]

---

[48] Preston Hollow's Resp. at 32.

[49] That is, to prevail on appeal given the jury's findings adverse to him, Mendell had to show that there was legally or factually insufficient evidence supporting the jury's verdict that

*Id.* at *14. Thus, the court affirmed the trial court's actual damages judgment against (Mendell) the trustee. *Id.* at *14, 31.

[¶ 40]   That court later addressed challenges to the actual and punitive damages awards based on arguments that there was legally and factually insufficient evidence to support the jury's findings that the trustee breached her fiduciary duties with the mental state required to support awarding actual and punitive damages. *Id.* at *16–23. However, that opinion does not address whether the liability limitation clause applied to prevent the recovery of punitive damages in that case. *See id.* Accordingly, *Mendell* does not guide this court here.

### ii. *Ridge Natural Resources, L.L.C. v. Double Eagle Royalty*

[¶ 41]   Preston Hollow next urges that punitive damages serve a vital role by deterring and punishing egregious breaches of trust.[50] From there, it posits that reading the punitive damages waiver to bar punitive damages in instances involving intentional, malicious, or grossly reckless misconduct would violate Civil Practice and Remedies Code § 41.003(a)(1)'s safeguards.[51]

---

he acted in bad faith, intentionally, or with reckless disregard for the appellees' interests, which Mendell failed to do.

[50] Preston Hollow's Resp. at 32.

[51] Preston Hollow's Resp. at 32.

Preston Hollow then cites to *Ridge Natural Resources, L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105 (Tex. App.—8th Dist. 2018) for the premise that courts refuse to enforce contract clauses that operate in direct conflict with statutory mandates or public policy.[52]

[¶ 42] The court rejects Preston Hollow's arguments for several reasons:

[¶ 43] First, *Ridge* was a common law fraud case that predating *Bombardier's* holding that a contract clause between sophisticated parties that precludes punitive damages in a common law case is enforceable. Thus, *Bombardier* implicitly overrules *Ridge*.

[¶ 44] Second, *Ridge* misreads § 41.003(a)(1) as creating a statutory right to recover punitive damages in a fraud case.[53] *See Ridge*, 564 S.W.3d. at 135–37. But as that appellant argued (*id.* at 136), § 41.003(a)(1)'s text provides only procedural standards governing punitive damages claims in

---

[52] Preston Hollow's Resp. at 32.

[53] Although this statute uses the words "Exemplary damages," this opinion uses "punitive damages" interchangeably.

common law fraud cases, without creating a statutory right to recover them.[54] *See* TEX. CIV. PRAC. & REM. CODE § 41.003(a)(1).

[¶ 45]   Although *§ 41.003(c)*, which that court (and Preston Hollow) did not address, concerns statutory causes of action that authorizes punitive damages in specified circumstances, that provision merely sets the claimant's burden of proof to recover punitive damages.

[¶ 46]   Finally, *Ridge* does not involve Trust Code § 114.007, let alone that statute's proper interpretation and application.

[¶ 47]   Accordingly, *Ridge* is not persuasive authority on this issue.

### c. The Master Indenture's punitive damages waiver is enforceable.

#### i. Overview

[¶ 48]   Preston Hollow argues that courts refuse to enforce contract clauses that operate in direct conflict with statutory mandates or public policy. But Preston Holow did not cite a statute with which Truist's punitive damages waiver directly conflicts.   Nor did the court find one.   However, Master Indenture § 8.01(e) comports with legislative intent to protect compensatory and equitable remedies resulting from certain trustee breaches by making

---

[54] The legislature in 2003 amended parts of the Civil Practice and Remedies Code Ch. 41., however, those changes do not affect *Bombardier's* holdings or this court's *Ridge* analysis. *See generally*, 2003 TEX. SESS. LAW SERV. Ch. 204 (H.B. 4) (Vernon's).

those remedies nonwaivable without also making punitive damages nonwaivable. *See* TRUST CODE §§ 111.0035, 114.001, and 114.007.

[¶ 49] Further, *Bombardier* recognizes that public policy generally permits punitive damages waivers between sophisticated parties. 572 S.W.3d at 231–32. And the Trust Code furthers this public policy by making the non-compensatory disgorgement remedy's deterrent effect nonwaivable. *See* TRUST CODE § 114.007(a)(2).

[¶ 50] In sum, construing Master Indenture § 8.01(e) according to its unambiguous terms and applying Trust Code §§ 111.0035, 114.001, and 114.007, pursuant to their plain language and the applicable rules of construction yields the conclusion that the punitive damages waiver is enforceable.

### ii. Contract Construction

[¶ 51] Whether Master Indenture § 8.01(e) precludes Preston Hollow's ability to recover punitive damages is a matter of contract and statutory construction.[55]

---

[55] The parties did not raise whether that clause limits Preston Hollow's compensatory damages. Thus, the parties and the public should not read this opinion to express any opinion on that issue, which is not before the court.

[¶ 52]   Here, neither side contends the Master Indenture is ambiguous on this issue.  And the court agrees with them: The parties objectively agreed that Truist would not be responsible for punitive damages for any misconduct.[56]  *See Inwood Nat'l Bank,* 706 S.W.3d at 347 (courts can determine parties' rights from unambiguous agreements); *U.S. Polyco*, 681 S.W.3d at 387 (court's objective to ascertain and give effect to the parties' intent expressed in the agreement).  Thus, whether Trust Code § 114.007 overrides that agreement is a matter of statutory construction.

### iii. Statutory Construction.

[¶ 53]   As a matter of statutory construction, the court concludes that the legislature did not bar enforcing the punitive damages waiver because the Trust Code, particularly §§ 111.0035, 114.001, and 114.007, does not expressly preclude such waivers and those sections support permitting them.

[¶ 54]   For starters, § 111.0035 provides that certain mandatory default protections—including § 114.007's restrictions on exculpation clauses—may not be limited by agreement.  But § 111.0035 does not expressly bar punitive damages waivers.  Nor do §§ 114.001 and 114.007.

---

[56] The court does not address that clause's enforceability regarding other potential recoveries.

[¶ 55]   Next, §§ 114.001 and 114.007 are complementary statues that should be construed together (along with § 111.0035) to also provide certain nonwaivable recoveries related to trustee breaches.   TEX. GOV'T. CODE § 311.021(2); *Janvey*, 487 S.W.3d at 572.

[¶ 56]   To that end, Trust Code § 114.001, captioned "Liability of Trustee to Beneficiary," concerns beneficiaries' remedies when a trustee breaches its trust duties.  Specifically, that statute subjects breaching trustees to equitable constructive trust, disgorgement, and accounting remedies.  *See* TRUST CODE § 114.001(a).   Additionally, it contemplates compensatory damages resulting from trustee breaches:

> (c) A trustee who commits a breach of trust is chargeable with any damages resulting from such breach of trust, including but not limited to:  (1) any loss or depreciation in value of the trust estate as a result of the breach of trust; (2) any profit made by the trustee through the breach of trust; or (3) any profit that would have accrued to the trust estate if there had been no breach of trust.

TRUST CODE § 114.001(c).  But § 114.001 does not mention punitive damages.

[¶ 57]   Likewise, the Trust Code places these limitations on trustee exculpation clauses:

> (a) A term of a trust relieving a trustee of liability for breach of trust is unenforceable to the extent that the term relieves a trustee of liability for: (1) a breach of trust committed: (A) in

bad faith; (B) intentionally; or (C) with reckless indifference to the interest of a beneficiary; or (2) any profit derived by the trustee from a breach of trust.

*Id.*, § 114.007(a); *see also id.*, § 111.0035(b)(4)(B) (trust may not limit a trustee's duty to act in in good faith and in accordance with the purposes of the trust). However, nothing in this statute expressly bars punitive damages waivers.

[¶ 58] In short, §§ 111.0035, 114.001, and 114.007 express legislative intent regarding (i) a trustee's liabilities to beneficiaries generally, (ii) and liabilities associated with trustee breaches specifically, (iii) beneficiaries' remedies for those breaches, and (iv) which remedies are nonwaivable. But nowhere do those statutes state that punitive damages are nonwaivable.

[¶ 59] Had the legislature intended to bar clauses that exclude awarding punitive damages connected to a breach of trust committed in bad faith, intentionally, or with reckless indifference to a beneficiary's interests, it would have done so. But it did not. Thus, those omissions individually and collectively reflect legislative intent that punitive damages are waivable in sophisticated agreements. *See City of Houston v. Williams*, 353 S.W.3d 128, 145 (Tex. 2011) (*inclusio unius* a sound construction maxim absent a valid

alternative construction); Scalia and Garner, *Reading Law: The Interpretation of Legal Texts*, 107–11 (2012).

[¶ 60] Moreover, § 114.007(a)(2)'s mandatory protection for the disgorgement of profits a trustee obtains from a breach of trust serves a deterrent purpose like punitive damages. That is, punitive damages are not compensatory; they exist to punish the defendant for outrageous conduct and deter future such behavior by that defendant or others. *Bombardier*, 572 S.W.3d at 230.

[¶ 61] Similarly, disgorging improper trustee benefits does not compensate for beneficiary losses. Instead, it serves to punish trustee misconduct and to deter it and others from engaging in similar future conduct. So, § 114.007(a) strikes a balance between (i) contract freedom and (ii) deterring and punishing trustees for their breaches.

[¶ 62] Finally, *Bombardier's* reasoning provides a paradigm for analyzing whether the Trust Code bars punitive damages waivers. Specifically, *Bombardier* reasons that the punitive damages waiver was enforceable there because it did not preclude liability for fiduciary breaches or prevent the buyer from recovering compensation for its injury. *See Bombardier*, 572 S.W.3d at 232. Likewise, enforcing Master Indenture's

punitive damages waiver here does not deprive Preston Hollow of its non-punitive damages remedies.

[¶ 63]   Accordingly, the court concludes that the Trust Code, including § 114.007, does not bar enforcing the Master Indenture § 8.01(e)'s liability limitation clause.

## D. Second Issue

[¶ 64]   The second issue is whether the Master Indenture's punitive damages exclusion also applies to claims based on alleged Bond Indenture breaches.   The answer is "yes" because (i) the Master Indenture and Bond Indenture are separate documents that are integral parts of a single agreement involving multiple parties and (ii) those contracts reference the same project and financing.   Indeed, the parties collectively refer to both documents under the singular title "Bond Documents" throughout their submissions.

[¶ 65]   Generally, separate contracts executed at the same time, for the same purpose, and in the same transaction are considered one instrument and construed together.   *CC&T Enterprises, L.L.C. v. Texas 1031 Exch. Co.*, 673 S.W.3d 631, 642 (Tex. 2023); *see Rieder v. Woods*, 603 S.W.3d 86, 94–95 n.35 (Tex. 2020); *Sullivan v. Microsoft Corp.*, 618 S.W.3d 926, 931–32 (Tex. App.—8th Dist. 2021, no pet.).

[¶ 66]  Here, the Master Indenture and Bond Indenture were executed as of the same time and as part of the same bond financing Senior Care used for the *Inspired Living at Missouri City* project.[57]  Both documents refer to that project.[58]  And the Master Indenture serves as a security agreement for the loan related to the bonds.  In fact, paragraph 12 of Preston Hollow's petition describes the documents connected and integral relationship.[59]

[¶ 67]  Accordingly, the court concludes that the punitive damages waiver applies to claims under either document.

## E. Third Issue

### 1. Introduction

[¶ 68]  The parties also asked the court to provide guidance regarding the nature of Truist's continuing duties to Preston Hollow after Truist resigned as trustee and was replaced by substitute trustees.

[¶ 69]  The parties agree—and the court concurs—that resignation does not relieve a trustee of liability for any claims that accrued before a

---

[57] *See* Truist App'x. at 6, 131 (bonds' purpose under both agreements is to finance the Missouri City project, both dated as of January 1, 2017); *compare generally* Truist App'x. 1–125 with 126–230.

[58] *See* Truist App'x. 6, 131.

[59] *See* POP. ¶s 11–12.

trustee's resignation and replacement. *See Hoenig v. Tex. Com. Bank, N.A.*, 939 S.W.2d 656, 663 (Tex. App.—4th Dist. 1996, no writ); *see also* Restatement (Third) of Agency § 8.04 (2006) ("Throughout the duration of an agency relationship, an agent has a duty to refrain from competing with the principal and from taking action on behalf of or otherwise assisting the principal's competitors.").

[¶ 70]   Next, the court addresses Truist's potential post-termination fiduciary duties.

### 2. Contract Duties

[¶ 71]   Truist's contract duties ended when it resigned and was replaced as trustee, subject to any surviving contract duties outlined in the Bond Documents, none of which were presented to the court. *See Rep. Nat. Bank & Trust Co. v. Bruce*, 105 S.W.2d 882, 885 (Tex. 1937) (trust may set how trustee may be discharged of their duties); *see also Illinois Tool Works, Inc. v. Harris*, 194 S.W.3d 529, 535 (Tex. App.—14th Dist. 2006, no pet.) (contract duties end after valid termination).

### 3. Fiduciary Duties

[¶ 72]   Fiduciary duties are different.  Like other agency relationships, trustee fiduciary duties generally terminate with the relationship creating

those duties.  *Clinkenbeard v. Cent. Sw. Oil Corp.*, 526 F.2d 649, 652 (5th Cir. 1976); *Maeberry v. Gayle*, 955 S.W.2d 875, 879 (Tex. App.—13th Dist. 1997, no pet.) (trustee); 2A C.J.S. Agency § 293 (2025) ("In general, following the absolute termination of the agency relationship, the rules as to the duties of loyalty and good faith owed by the agent to the principal do not apply.").  Once the agency terminates, the agent may deal with the principal at arm's length. *Clinkenbeard*, 526 F.2d at 652.

[¶ 73]  But certain common law duties survive the relationship's termination.  One such duty is to not use or disclose the principal's confidential information.  *Id.* at 652 n.3; *Miller Paper Co. v. Roberts Paper Co.*, 901 S.W.2d 593, 600 (Tex. App.—7th Dist. 1995, no writ); Restatement (Third) Of Agency § 8.05 (2006) (Comment (c)) ("An agent's duties concerning confidential information do not end when the agency relationship terminates."); 2A C.J.S. Agency § 293 (2025) (same).

[¶ 74]  Thus, Truist has a surviving duty to not use *Preston Hollow's* confidential or proprietary information, acquired during Truist's tenure as trustee, against Preston Hollow.  Otherwise, Truist's fiduciary duties to Preston Hollow ended when Truist resigned as trustee and at least one substitute trustee accepted its appointment as trustee.

## Conclusion

[¶ 75]  These conclusions apply during this case unless the court later modifies them based on new information.

[¶ 76]  In reaching these conclusions, the court (i) assumes the truth of Preston Hollow's factual allegations in its live pleadings and the applicable contracts and (ii) makes no factual determinations or suggestions regarding whether Truist's alleged misconduct occurred or what other remedies Preston Hollow may have if that conduct occurred.

_____
BILL WHITEHILL
Judge of the Texas Business Court,
First Division

SIGNED: December 19, 2025